**ESTATE OF Joseph RE (by Vivian R. Re and Patricia Re Coarsely, the personal representatives of the Estate of Joseph Re),**

**and**

**Vivian R. Re, John M. Re and Joseph O. Re, Plaintiffs,**

**v.**

**KORNSTEIN VEISZ & WEXLER, Daniel J. Kornstein, Howard S. Veisz and Marvin Wexler, Defendants.**

**No. 94 Civ. 2369(SS).**

United States District Court, S.D. New York.

April 2, 1997.

---

Ann L. Detiere, New York City, for Plaintiffs.

Coblence & Warner, Kenneth E. Warner, New York City, for Defendants.

## AMENDED OPINION AND ORDER

SOTOMAYOR, District Judge.

Plaintiffs bring this action, advancing four claims arising out of defendants' allegedly inadequate representation of Joseph Re during arbitration proceedings held in connection with Mr. Re's removal from his position as a partner with Bear Stearns & Co. ("Bear Stearns"). Specifically, plaintiffs seek damages flowing from defendants' alleged breach of contract, breach of fiduciary duty, legal malpractice, and unjust enrichment. In an initial round of briefing, defendants moved for summary judgment as to the alleged breach of fiduciary duty and unjust enrichment claims, arguing that these claims are barred under an applicable three year limitations period. Though conceding that Mr. Re did not bring suit until four years after his claims accrued, plaintiffs responded that the applicable limitations period for a claimed breach of fiduciary duty, to the extent that it involves a relationship formed pursuant to a contract, is six years. Before the Court had an opportunity to resolve this issue, defendants submitted an omnibus motion for summary judgment, interposing numerous additional grounds for the dismissal of all four claims. Following the Court's receipt of voluminous materials submitted by the parties in connection with this new motion, New York's legislature amended the statute of limitations applicable in malpractice actions to three years, "regardless of whether the underlying theory is based in contract or in tort." See C.P.L.R. 214[6] as amended by chapter 623 of the Laws of 1996.

For the reasons that follow, the Court finds that plaintiffs' claims were timely when filed, and that it would offend notions of due process under New York law to dismiss those claims by the retroactive application of the amended limitations period. With respect to the merits of plaintiffs' claims, there is insufficient evidence either of negligence or of causation to support plaintiffs' theories of malpractice and breach of contract. There are sufficient factual questions, however, to preclude summary judgment as to the alleged breach of fiduciary duty.[1]

## BACKGROUND

In February 1985, Mr. Re was asked to resign from his position as a general partner with Bear Stearns. He was told, in essence, that he was no longer making any contribution to the partnership. Given no real choice in the matter, Mr. Re did not resist the formal termination of his partnership interest on April 30, 1985. Several months later, in October 1985, Bear Stearns "went public." Mr. Re concluded that the partnership's earlier decision to remove him from their ranks had been motivated by their desire to deprive him of the financial benefits of participating in Bear Stearns' public offering.

In the Fall of 1987, Mr. Re contacted the law firm of Kornstein, Veisz & Wexler ("Kornstein Veisz"), to represent him in an action against Bear Stearns. Though advising Mr. Re that he was unlikely to succeed in any action against his former colleagues, defendant Wexler accepted Mr. Re's ultimate decision to proceed with a lawsuit. (Wexler 4/18/96 Aff. Ex. 6, Ltr. from Wexler to Re of 6/1/88.) Hoping to avoid a binding arbitration provision in the Bear Stearns partnership agreement, defendants filed a state court action on Mr. Re's behalf, in August of 1988, alleging breach of fiduciary duty against the individual members of the Bear Stearns Executive Committee. Under Mr. Wexler's theory of the case, defendants had breached their fiduciary duties by concealing from Mr. Re, as of the time they forced his resignation, their then existing intention to take Bear Stearns public.

As anticipated by defendant Wexler in his correspondence to Mr. Re, the Bear Stearns

---

1. Defendants have not submitted any briefing addressed specifically to the appropriate disposition of plaintiffs' claim for unjust enrichment, but have reasoned that the survival of this claim depends upon the Court's ruling as to the predicate breach of fiduciary duty. (Memo. in Sup. of Mot. For S.J. at 3, n. 2.) Plaintiffs have not disputed this assertion.

defendants resisted the state court action, through their counsel, Stroock & Stroock & Lavan ("Stroock"), by invoking an arbitration provision included in the partnership agreement. In February 1988, Bear Stearns succeeded on its motion to compel arbitration; the following month, defendants filed a Demand for Arbitration with the American Arbitration Association ("AAA"). (Wexler 4/18/96 Aff. Ex. 11.) Instead of requesting that Mr. Re's claims be heard before a panel three arbitrators, defendant Wexler elected to have the matter heard before a single arbitrator recommended by the AAA, Mr. Finley.

After considerable discovery, including depositions by defendant Wexler of the Bear Stearns defendants, the arbitration took place in December 1989. The proceedings lasted for three days, with defendant Wexler calling two witnesses on Mr. Re's behalf: Mr. Re as well as one of his former partners with Bear Stearns, Nicholas Purpura. Stroock called three witnesses for Bear Stearns, including two of the individual defendants, and Ernest Rubenstein, a partner with the law firm of Paul, Weiss, Rifkind, Wharton & Garrison ("Paul Weiss"). Paul Weiss had long been Bear Stearns' corporate counsel, and Mr. Rubenstein had advised Bear Stearns on the possibility of going public. Following the presentation of witnesses and evidence before Mr. Finley, defendant Wexler submitted a 93 page post-hearing brief, which prompted an opposition by Stroock, a reply by defendants, and a surreply by Stroock. (Wexler 4/18/96 Aff. Ex.'s 21, 22, 23, 24.)

At the conclusion of the arbitration proceedings, Mr. Finley complimented counsel for both sides on the "thoroughly professional" manner in which they conducted themselves. (Arbitration Hearing Tr. at 42 1.) Shortly thereafter, in February 1990, Mr. Finley ruled against Mr. Re. (Wexler 4/18/96 Aff. Ex. 26.) The ruling was issued without any written opinion. More than four years later, in April 1994, Mr. Re commenced this action, alleging that defendants failed to alert Mr. Re to a conflict of interest bearing upon their ability to provide him adequate representation, and that they made numerous tac-

tical errors in connection with the arbitration. Mr. Re died during these proceedings, and his estate has been substituted as plaintiffs.

## I. Defendants' Representation Of Plaintiffs During Arbitration

### A. Alleged Conflict Of Interest

The alleged conflict of interest involves defendants' professional relationship with Bear Stearns' corporate counsel, Paul Weiss. Defendant Wexler, like the other individual defendants (all partners with Kornstein Veisz), had worked as associates at Paul Weiss at various times between 1973 and 1981. (Wexler 4/18/96 Aff. ¶ 36; Pl.'s 3(g) stmt. ¶ 11.) After leaving Paul Weiss, defendants continued work on approximately five matters in which they were involved while associates, and have since had approximately a dozen cases referred to them from their former firm. (Wexler 4/18/96 Aff. Ex. 31.) In at least one instance, during the same period that they represented Mr. Re, defendants served as co-counsel with Paul Weiss. (Detiere 5/16/96 Aff. Ex. 31.) None of these cases are alleged to have involved matters at issue in Mr. Re's dispute with his former partnership. These cases amounted to approximately $ 500,000 of business for defendants, with under $ 200,000 of this coming after 1986. (Wexler 4/18/96 Aff. Ex. 31.) Paul Weiss referrals thus accounted for approximately 2%–3% of defendants' business during the mid to late 1980's, the period during which Kornstein Veisz represented Mr. Re.

In their capacity as Bear Stearns' corporate counsel, Paul Weiss was consulted by the partnership during the time that it was contemplating going public, or otherwise reorganizing. (Wexler 4/18/96 Aff. Ex. 32.) Prior to the arbitration, in an effort at "informal discovery" into the specifics of this consultation, Mr. Wexler visited with Mr. Rubenstein. (Wexler 4/18/96 Aff. ¶ 36.) In a letter to Mr. Re, Mr. Wexler reported that Mr. Rubenstein "had tried to persuade" Mr. Wexler that there was "no merit" to Mr. Re's claim. (Wexler 4/18/96 Aff. Ex. 30.) Mr. Wexler characterized the specific information provided by Mr. Rubenstein as "not favor-

able" to Mr. Re, and reiterated his earlier concern that Mr. Re's claim was "highly problematic." (*Id.*)

Though Bear Stearns was not represented by Paul Weiss during the arbitration against Mr. Re, Mr. Rubenstein was one of only three witnesses called to testify on Bear Stearns' behalf. Mr. Rubenstein's testimony centered upon the timing and nature of Paul Weiss's involvement in Bear Stearns' decision to go public. (Arbitration Hearing Tr. 402–418.) Mr. Rubenstein further testified that he had recounted these same matters in a meeting with Mr. Re, which Mr. Re attended with an attorney (not one of the defendants), several months after Bear Stearns' public offering. Mr. Wexler did not cross examine Mr. Rubenstein. Plaintiffs contend that Wexler "may (or should)" have questioned Mr. Rubenstein, and that his failure to do so reflects defendants' friendly relationship with Paul Weiss. (Opposition and Cross Motion at 13.) Defendants insist that they had the greatest chance of neutralizing Mr. Rubenstein's testimony, not by refuting it, but by persuading the arbitrator that it was, as a matter of law, irrelevant. (Wexler 4/18/96 Aff. ¶ 35(c).)

### B. *Alleged Malpractice*

In their amended complaint, plaintiffs point to numerous other examples of defendants' alleged "diminished rigor" in representing Mr. Re. The two most egregious errors, according to plaintiffs, concern defendants' failure to present the arbitrator with sufficient evidence as to Mr. Re's damages, and defendants' failure sufficiently to emphasize a particular legal argument during the arbitration proceedings.

Though he briefly consulted Mr. Re's accountant, Ms. Halpern, concerning the extent of Mr. Re's losses in connection with Bear Stearns' public offering, Wexler had no expert or other witness testify on the issue of damages during the arbitration hearing. (Halpern 4/26/96 Aff. ¶ 3.) According to plaintiffs, Wexler disregarded Mr. Finley's clear and repeated requests for evidence on the damages question. Mr. Wexler explains that he sought to avoid the risk that a damages witness would be subject to unfavorable

cross-examination. (Wexler 4/18/96 Aff. ¶ 35(d).) Therefore, Wexler decided to rely upon documentary evidence introduced during the proceedings and to submit a full evaluation of damages in his post-hearing brief. In the post-hearing brief, there is a discussion of damages, referencing assorted documentary evidence from the proceedings, and requesting approximately § 4 million in relief. (Wexler Aff. Ex. 21 at 76–91.) Plaintiffs criticize the discussion as both substantively flawed and procedurally too late.

Plaintiffs' other major complaint concerns defendants' failure, during the arbitration, to emphasize a supposedly "compelling" breach of contract theory. (Detiere 5/16/96 Aff. ¶ 58.) Plaintiffs rely upon Section 10.16 of Mr. Re's partnership agreement with Bear Stearns, which provides:

> If, after the final payment of his Capital is made to a Withdrawing Partner ... an asset of the Partnership ... shall become known and liquidated, the Withdrawing Partner shall receive that share of such asset to which he was entitled (directly or indirectly) during the period or periods to which the asset is attributable.

(Letter from Detiere to the Court of 11/26/96.) According to plaintiffs, "[s]ince the. conversion of the partnership into a public corporation ... would have arguably been an asset discovered very shortly 'after the final payment of his Capital,' Re was presumably entitled to 'receive that share of such asset' under § 10.16 of the partnership agreement." (Detiere 5/16/96 Aff. Ex. P, at 82.) Defendants depict this argument as having little or no merit: its success depending upon a favorable reading of the term "asset," and the phrase "after the final payment." (Letter from Wexler to the Court of 12/20/96.) Defendants also point out that, in any event, they made the argument in their post-hearing brief. Plaintiffs note, however, that defendant Wexler gave the issue only cursory attention, relegating it to the tail end of his 93 page submission, and setting out the argument in little more than a page.

Though plaintiffs place their greatest emphasis upon those factors already discussed (*i.e.* the alleged conflict of interest, the failure to proffer evidence on damages, and the

failure to stress Section 10.16 of the partnership agreement), they identify a host of other deficiencies in defendants' work as Mr. Re's attorneys. For instance, the only witness defendants called on Mr. Re's behalf, other than Mr. Re, was Mr. Purpura, one of Mr. Re's former partners with Bear Stearns. According to Mr. Purpura, the only subject matter that Mr. Wexler discussed with him in advance of the proceedings involved rumors that Mr. Purpura had heard to the effect that Bear Stearns planned to go public before the time that Mr. Re was removed from the partnership. (Purpura 4/30/96 Aff. ¶ 3.) A review of the transcript from the arbitration proceedings reveals that Mr. Purpura was not questioned as to these rumors, however, and that he had difficulty responding to several of those questions that were posed to him. (Arbitration Hearing Tr. 249–91.) Thomas Fleming, one of defendant Wexler's former associates, had prepared Mr. Purpura in advance of his testimony, and questioned him during the proceedings. (Fleming 7/17/96 Aff.) In the view of both Mr. Fleming and defendant Wexler, Mr. Purpura simply turned out to be a disappointing witness. (*Id.* ¶ 7; Wexler 6/19/96 Aff. ¶ 22.)

A number of plaintiffs' other allegations concern Mr. Finley's suitability to preside over the dispute between Mr. Re and Bear Stearns. Plaintiffs also question defendants' decision to proceed before a single arbitrator instead of before a panel of three. (Am. Comp.¶ 46.) As for the particular selection of Mr. Finley, plaintiffs complain that Mr. Finley was of counsel at a law firm that had been retained to advise Bear Stearns on issues unrelated to Mr. Re's case, and that defendants never alerted Mr. Re to this potential conflict. (*Id.* ¶ 49.) Defendant Wexler responds that he viewed Mr. Re's case to be weak, and that he therefore thought it unlikely that two out of three arbitrators could be persuaded to rule in his client's favor. Moreover, Mr. Finley disclosed any potential conflict to the attorneys in Mr. Re's case, and assured both sides that his judgment would in no way be compromised. (Wexler 4/18/96 Aff. Ex. 16.) Defendants explain that they decided to remain with Mr. Finley because he was an experienced and well-regarded attorney who had himself been involved in a conflict with his former partners.

## II. *The Motions For Summary Judgment*

Defendants initially moved for summary judgment solely as to the alleged breach of fiduciary duty and unjust enrichment, and argued that those claims were untimely filed under an applicable three year statute of limitations. Conceding that they did not commence this action until four years after Mr. Re's claims accrued, plaintiffs responded that New York's six year statute of limitations, applicable to contract actions, governs the present dispute.

In an "omnibus" motion for summary judgment, filed before briefing concluded on the limitations question, defendants asserted numerous substantive grounds for the dismissal of all four of plaintiffs' claims. They argued that the alleged mistakes in representation were actually reasonable strategic decisions, and that defendants' relationship with Paul Weiss did not create any conflict of interest and did not give rise to any breach of fiduciary duty. Moreover, defendants argued that any negligence by counsel was not the "but for" cause of plaintiffs' defeat at arbitration. In response, plaintiffs made a cross motion for summary judgment as to two sets of their allegations: i) the alleged malpractice arising out of defendants' failure to provide the arbitrator with evidence on the question of damages, and ii) the alleged breach of fiduciary duty involving defendants' relationship with Paul Weiss. As to their remaining claims and allegations, plaintiffs argued that there were facts in dispute requiring a trial.

Following this second round of briefing, New York's legislature amended C.P.L.R. 214[6], essentially for the purpose of overruling the very line of authority upon which plaintiffs had relied to defend their action as timely. Under the amended provision, a claim for legal malpractice must be brought within three years of accrual, whether that claim is framed in contract or in tort. The passage of this provision precipitated another round of letter briefing in which the parties argued as to whether the recent amendment to C.P.L.R. 214[6] can apply retroactively to

bar plaintiffs' claims, even to the extent that those claims were timely when filed.

In short, there are numerous issues which have been raised by the parties, and the Court has had the opportunity to review a voluminous record in assessing the arguments which have been made. For the reasons which follow, defendants' motion for summary judgment is granted in part, and denied in part. Plaintiffs' motion for summary judgment is denied.

## DISCUSSION

Summary judgment is required when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "The moving party has the initial burden of 'informing the district court of the basis for its motion' and identifying the matter 'it believes demonstrate[s] the absence of a genuine issue of material fact.'" *Leibovitz v. Paramount Pictures Corp.,* 948 F.Supp. 1214, 1217 (S.D.N.Y.1996) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). Once the movant satisfies its initial burden, the non-moving party must identify "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). In assessing the parties' competing claims, the Court must resolve any factual ambiguities in favor of the nonmovant. *See McNeil v. Aguilos,* 831 F.Supp. 1079, 1082 (S.D.N.Y.1993). It is within this framework that the Court must finally determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[2] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

The Court will begin its analysis by considering the question initially briefed by the parties—*i.e.,* whether plaintiffs' action was timely when filed. See Section IA, *infra.* Because plaintiffs' claims were timely when filed, the Court will proceed to consider whether C.P.L.R. 214[6], as amended, applies retroactively to require the dismissal of plaintiffs' Complaint. *See* Section IB, *infra.* Though it appears likely that New York's legislature intended for the amended C.P.L.R. 214[6] to apply retroactively, the Court finds that such an application would offend basic notions of due process under New York law. Because plaintiffs' claims cannot be barred by the revised limitations period, the Court must consider the sufficiency of the evidence in support of those claims. *See* Section II, *infra.* As the Court ultimately concludes, plaintiffs' malpractice and contract claims cannot survive defendants' motion for summary judgment, but plaintiffs have raised a sufficient factual dispute to proceed with the claimed breach of fiduciary duty.

## I. Statute of Limitations

### A. Pre–Amendment SOL

For reasons set forth by New York's Court of Appeals in *Santulli v. Englert, Reilly & McHugh,* 78 N.Y.2d 700, 579 N.Y.S.2d 324, 586 N.E.2d 1014 (1992), plaintiffs' action was timely when filed. Like the plaintiffs here, the plaintiff in *Santulli* waited until four years after his claims accrued before filing an action alleging attorney malpractice. Defendants moved to dismiss the complaint against them relying upon C.P.L.R. 214[6], which announces a three year limitations period applicable to malpractice actions. Acknowledging that their holding might effectively "nullify" this provision, the Court in *Santulli* rejected defendants' position, and permitted plaintiffs to proceed with their claims pursuant to the six year limitations period applicable in contract actions. *Santulli,* 78 N.Y.2d at 709, 579 N.Y.S.2d 324, 586 N.E.2d 1014.

As the starting point for its analysis, the Court in *Santulli* reiterated language from

2. As noted,. Mr. Re passed away during the proceedings in this case. Broadly speaking, under New York's "Dead Man's Statute," defendants cannot testify as to transactions or communications with Mr. Re, but must rely upon documentary evidence of such interactions. *See* C.P.L.R. 4519; *see generally Rosenfeld v. Basquiat,* 78 F.3d 84 (2d Cir.1996). Plaintiffs waive this protection, however, to the extent that they place at issue communications between Mr. Re and defendants. *Id.*

an earlier decision providing that " the choice of applicable Statute of Limitations is properly related to the remedy rather than to the theory of liability." *Id.* at 707, 579 N.Y.S.2d 324, 586 N.E.2d 1014 (quoting *Sears, Roebuck & Co. v. Enco Assocs.,* 43 N.Y.2d 389, 394–95, 401 N.Y.S.2d 767, 770, 372 N.E.2d 555, 557 (1977)). The fact that plaintiff framed his claim as an alleged malpractice, then, according to the *Santulli* Court, did not automatically trigger the application of C.P.L.R. 214[6]. In assessing the nature of plaintiffs requested remedy, the Court noted that "all potential liability of the defendant ar[ose] out of the agreement retaining the firm as attorneys." *Id.* In other words, however he might have styled his cause of action, defendant was pursuing "damages to his pecuniary interest identical to those which would be recoverable in [a] contract action." *Id.* Because he pursued such relief, the Court concluded that plaintiff was entitled to proceed under the six year limitations period applicable to contract claims. *Id.; see also Video Corp. of America v. Frederick Flatto Assocs., Inc.,* 58 N.Y.2d 1026, 1028, 462 N.Y.S.2d 439, 448 N.E.2d 1350 (1983) ("an action for failure to exercise due care in the performance of a contract insofar as it seeks recovery for damages to property or pecuniary interests recoverable in a contract action is governed by the six-year contract Statute of Limitations.").

As was the case in *Santulli,* plaintiffs in this action have framed a variety of different claims around defendants' alleged failure to perform adequately as plaintiffs' legal counsel. Under the reasoning of *Santulli,* the limitations period applicable to these claims must accordingly be a function of the remedy plaintiffs seek, and not the theories they advance. *Santulli,* 78 N.Y.2d at 707, 579 N.Y.S.2d 324, 586 N.E.2d 1014; *see also Matter of Paver & Wildfoerster (Catholic High School Assn.),* 38 N.Y.2d 669, 672, 382 N.Y.S.2d 22, 23, 345 N.E.2d 565, 566 (1976) ("the general principle [is] that time limitations depend upon, and are confined to, the form of the remedy."). In this regard, all of plaintiffs' claims against defendants arise out of a relationship formed between the parties pursuant to a retainer agreement (*i.e.,* a contract), and plaintiffs are seeking to recover

pecuniary losses they ascribe to defendants' misconduct. Under the logic of the *Santulli* line of authority, then, however plaintiffs' claims are characterized—as breach of fiduciary duty, malpractice, or breach of contract—plaintiffs filed their complaint within the six year limitations period then applicable.

Defendants resist this conclusion, at least as to the alleged breach of fiduciary duty, by relying upon the Court of Appeals decision in *Loengard v. Santa Fe Industries, Inc.,* 70 N.Y.2d 262, 519 N.Y.S.2d 801, 514 N.E.2d 113 (1987). In *Loengard,* the minority shareholders of Kirby Lumber Corp. ("Kirby"), alleging breach of fiduciary duty, sought to be restored to their status as full stockholders following a freeze out merger between Kirby and the defendant corporation. Reasoning that "legal remed[ies] would not be adequate," the Court characterized plaintiffs' desired relief as "equitable in nature." *Id.* at 267, 519 N.Y.S.2d 801, 514 N.E.2d 113. On this basis, the *Loengard* Court applied a six year limitations period, permitting plaintiffs to proceed with their claim.

Contrary to defendants' position, the *Loengard* Court did not announce a bright line rule pursuant to which an alleged breach of fiduciary duty is governed by a six year limitations period in the event that equitable damages are sought, and a three year limitations period in the event that legal damages (*i.e.,* money) are pursued. *See Frank Management, Inc. v. Weber,* 145 Misc.2d 995, 549 N.Y.S.2d 317, (N.Y. County 1989) ("Although the court in *Loengard* applied the six year limitations period where the remedy sought was equitable . . . the six year period has been applied where the damages alone have been sought."). Such an approach would not comport with the subsequent Court of Appeals decision in *Santulli.* The *Santulli* Court cited *Loengard* for the proposition that the appropriate limitations period does not depend upon the theory pursued, but the remedy sought. *Santulli,* 78 N.Y.2d at 708, 579 N.Y.S.2d 324, 586 N.E.2d 1014. Thus, *Loengard* cannot be understood to have announced a rule uniquely applicable to claims alleging breach of fiduciary duty. Moreover, *Santulli* did not attach any particular signifi-

cance to the legal/equitable distinction drawn by the Court in *Loengard;* the six year limitations period was applicable in *Santulli* because plaintiff sought "damages to his pecuniary interests identical to those which would be recoverable in the contract action." *Id.* These are the same damages plaintiffs now seek—whether in connection with the alleged malpractice, or breach of fiduciary duty—and their action was thus timely when filed. *See Sears Roebuck,* 43 N.Y.2d at 396, 401 N.Y.S.2d 767, 372 N.E.2d 555 ("It should make no difference then how the asserted liability is classified or described ... it suffices that all liability alleged in this complaint had its genesis in the contractual relationship of the parties.").

## B. Retroactive Application of SOL

■ The Court of Appeals decision in *Santulli* came under attack because it allowed parties to circumvent the three year limitations period applicable to malpractice actions under C.P.L.R. 214[6]. The New York legislature recently responded by amending C.P.L.R. 214[6], in September 1996, such that it now governs malpractice actions "regardless of whether the underlying theory is based in contract or in tort." This is plainly a rebuke of the *Santulli* line of authority, with its emphasis upon the contractual "genesis" of malpractice claims. Under the amended provision, then, courts must treat any action involving a professional's alleged failure to exercise due care as a unique species of tort properly governed, in all circumstances, by a three year limitations period. The very grounds upon which plaintiffs managed to file a timely complaint four years after defendants' alleged malpractice have thus been written out of the governing legislation. If the revised provision applies to their complaint, plaintiffs' action must be dismissed.

### 1. State Law Retroactivity

■ "Generally, statutes are applied prospectively, unless there is a clear legislative indication to the contrary." *Rudin Management Co. Inc. v. Commissioner, Dept. Of Consumer Affairs,* 213 A.D.2d 185, 623 N.Y.S.2d 569 (1st Dep't 1995); *see also*

*Brown v. Ellis,* 145 Misc.2d 1085, 548 N.Y.S.2d 841, 846 (Richmond County 1989) ("Ordinarily, statutes are presumed to operate prospectively unless a contrary intention unequivocally appears."), *aff'd.* 150 Misc.2d 375, 575 N.Y.S.2d 622 (1990); McKinney's Cons.Laws of N.Y., Book 1, Statutes § 51(c). "An exception to the foregoing is that remedial statutes, which are to be liberally construed, are to be given retroactive construction to the extent that they do not impair vested rights or create new rights." *Mendler v. Federal Insurance Co.,* 159 Misc.2d 1099, 607 N.Y.S.2d 1000, 1003 (N.Y. County 1993); *see also Brown,* 548 N.Y.S.2d at 847; McKinney's § 54 ("Remedial statutes constitute an exception to the general rule that statutes are not to be given a retroactive operation, but only to the extent that they do not impair vested rights.").

■ Thus far, only two New York trial courts have invoked these principles in order to determine whether the amended C.P.L.R. 214[6] applies to require the dismissal of malpractice actions that were timely when filed. These courts have reached conflicting results. *Compare Garcia v. Jonathan,* N.Y.L.J., Jan. 17, 1997 (1st Dep't Jan. 17, 1997) (holding that the amendments to C.P.L.R. 214[6] have "prospective application only.") *with Russo v. Waller,* N.Y.L.J., Feb. 25, 1997 (2d Dep't Feb. 25, 1997) (applying the amended CPLR 214[6] to dismiss malpractice action that was timely "as of the date of its commencement"). This Court must therefore apply the governing standards in an effort to anticipate how New York's highest state court will likely resolve this current split in authority. *See Herman Miller, Inc. v. Thom Rock Realty Co., L.P.,* 819 F.Supp. 307 (S.D.N.Y.1993) (citing *DeWeerth v. Baldinger,* 836 F.2d 103, 108 (2d Cir.1987).

The starting point for determining whether a provision is meant to apply retroactively, of course, is to look to the language of the provision itself. According to its terms, the recent amendment to C.P.L.R. 214[6] was to "take effect immediately." New York's Courts have considered virtually identical language on several occasions, but the results have not been uniform. *Compare Murphy v.*

*Bd. of Ed., North Bellmore Union*, 104 A.D.2d 796, 480 N.Y.S.2d 138, 139 (2d Dep't 1984) ("As a general rule statutes are to be construed as prospective only in the absence of an unequivocal expression of legislative intent to the contrary, and where a statute directs that it is to take effect immediately, it does not have any retroactive operation or effect"), *aff'd* 64 N.Y.2d 856, 487 N.Y.S.2d 325, 476 N.E.2d 651 (1985); *Lusardi v. Lusardi*, 167 A.D.2d 3, 570 N.Y.S.2d 376, 377 (3d Dep't 1991) ("Where, as here, the Legislature provides that the statutory provision shall take effect immediately, prospective application of the amendments is appropriate"); *Moynihan v. NYS Employees' Ret. System*, 192 A.D.2d 913, 596 N.Y.S.2d 570, 571 (3d Dep't 1993) ("We find lacking any indication of intent to provide retroactivity. Quite to the contrary, the amendment recites that it shall take effect immediately, which language this court has held provides a clear indication that prospective application is appropriate.") (citations omitted), *with McGuirk v. City School District*, 116 A.D.2d 363, 501 N.Y.S.2d 477, 479 (3d Dep't 1986) ("[T]he limiting amendment was expressly provided to take effect immediately, a factor consistent with the purpose of giving it retroactive effect.") (citations omitted); *Meegan "S" v. Donald "T"*, 103 A.D.2d 913, 478 N.Y.S.2d 150, 151 (3d Dep't 1984) ("[W]e note that the amendment was made operative immediately, instead of prospectively, thus implying retroactivity."), *rev'd on other grounds*, 64 N.Y.2d 751, 485 N.Y.S.2d 982, 475 N.E.2d 449 (1984); *Cady v. County of Broome*, 87 A.D.2d 964, 451 N.Y.S.2d 206, 207 (3d Dep't 1982). The Court takes these divergent outcomes as indication that such language must be understood in context. *See McGuirk*, 501 N.Y.S.2d at 479 ("retroactivity need not be explicitly set forth in the statute."). Standing alone, the "effective immediately" provision of the amendment is inconclusive. When considered alongside the legislative pronouncements accompanying its passage, however, it is the more reasonable inference that the legislature intended to apply the amended C.P.L.R. 214[6] even to pending actions.

In a "Memorandum In Support" of the legislation amending C.P.L.R. 214[6], New York state's legislature adopted unusually blunt language expressing dissatisfaction with the approach taken by the Court of Appeals in *Santulli:*

> The legislature of the State of New York had originally expressed its intent in enacting the statute of limitations for general malpractice in CPLR section 214[6] to be three years ... The courts have recently expanded the statute of limitations, in cases where the essential actions complained of consist of malpractice, to six years under breach of contract theory, thereby abrogating and circumventing the original legislative intent. Unless the legislature reaffirms its intent as to the statute of limitations to be applied in cases governed by ... Section 214[6] ..., the courts will continue to expand the statute of limitations in general malpractice cases ... to be governed by the six year breach of contract theory as set forth in CPLR 213[2]. It is essential that ... 214[6] ... of the CPLR be amended to reaffirm the legislative intent that where the underlying complaint is one which essentially claims that there was a failure to utilize reasonable care or where acts or omission or negligence are alleged or claimed, the statute of limitations shall ... be three years if the case comes within the purview of CPLR section 214[6] ... regardless of whether the theory is based in tort or in a breach of contract.

Thus, the legislature did not conceive of its amendment as a new provision, but as a rebuke of the Court of Appeals, designed to "reaffirm" that the limitations period applicable in malpractice actions is, and has properly been, three years. In view of the legislature's strong language, this Court finds it difficult to accept the Garcia Court's conclusion that the legislative history of the amendment to C.P.L.R. 214[6] is inconclusive. *Garcia*, N.Y.L.J., Jan. 17, 1997. By assailing *Santulli* as a misguided aberration, the legislature announced its intent to end the continued application of that decision—"effective immediately"—in all cases. *See Reynolds v. Martin*, 985 F.2d 470, 475–76 (9th Cir.1993) ("We would seriously undermine Congress' stated intent were we to hold that the deci-

sions it repudiated would live on in the federal courts for several years.").

The Court does not mean to suggest that it accepts the legislature's view that *Santulli* was wrongly decided. The Court simply concludes that by rejecting *Santulli*, the legislature revealed its intention to apply its recent enactment retroactively. The legislature could not, however, make a binding determination that *Santulli* was wrongly decided under the law in force at the time that the decision was rendered. *See Chatlos v. McGoldrick*, 302 N.Y. 380, 388, 98 N.E.2d 567 (1951) ("It is, of course, true that the legislature cannot come back a year later and by a new law, control the interpretation of the law that it passed a year earlier."); *City of New York v. Village of Lawrence*, 250 N.Y. 429, 447, 165 N.E. 836 (1929) ("Doubtless the legislative construction of the earlier statute is without binding force in any judicial proceeding."). As a practical matter, New York's present day legislature is simply in no better position than the state's courts to assess what the state's legislature intended, decades ago, when it originally enacted C.P.L.R. 214[6]. Of more basic concern, fundamental notions underlying the separation of powers counsel against permitting the legislature such a role in the interpretation of law. In more venerated terms, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803).

It is on the basis of these considerations that this Court cannot accept the approach adopted by the Court in *Russo*. Unlike the *Garcia* decision, which placed virtually no credence in the legislative history of the recent amendment to C.P.L.R. 214[6], the *Russo* Court was overly deferential. The Court avoided what it perceived to be constitutional problems relating to retroactivity by accepting the legislature's view that it was not passing new law, but merely correcting judicial error. *Russo*, N.Y.L.J., Feb. 25, 1997. Crediting this approach would compromise the separation of powers, and would provide too simple a tool for legislatures to enact improper *ex post facto* provisions under the guise of "correcting" prior court pronouncements. To the extent that there are constitutional implications to retroactivity, those implications cannot be so easily finessed; they must be dealt with directly.

2. Constitutionality

It has long been settled law in New York that, "[i]n order to pass constitutional muster, legislation retroactively shortening a period of limitations must provide a party within a reasonable time to commence an action." *O'Connor v. Maine–Endwell Central School District and Board of Education*, 133 Misc.2d 1126, 509 N.Y.S.2d 472, 473 (Broome County 1986); *see also Alston v. Transport Workers Union Of Greater New York*, 225 A.D.2d 424, 639 N.Y.S.2d 359, 360 (1st Dep't 1996) (" 'The only restriction upon the legislature, in the enactment of statutes of limitation is that a reasonable time be allowed for suits upon causes of action theretofore existing.' If a statute of limitations deprives a party 'of a reasonable time within which suit may be brought, it violates the constitutional provision that no person shall be deprived of property without due process of law.' ") (quoting *Gilbert v. Ackerman*, 159 N.Y. 118, 53 N.E. 753 (1899)); *Glod v. Ashland Chemical Co.*, 145 Misc.2d 200, 546 N.Y.S.2d 748, 754 (Oswego County 1989) (permitting the retroactive application of a reduced limitations period "so long as there remains a reasonable time for the commencement of suit."), *aff'd* 168 A.D.2d 954, 564 N.Y.S.2d 905 (1990); *McGuirk*, 501 N.Y.S.2d at 478 ("There is no constitutional impediment to legislation retroactively either extending a period of limitations or shortening such period, providing that a party has a reasonable time to commence the action under the shortened period."); *Dunkum v. Maceck Bldg. Corp.*, 256 N.Y. 275, 286, 176 N.E. 392 (1931) ("The validity of a statute of limitations which purports to bar a right which existed before the statute becomes effective depends upon whether the statute allows a reasonable time after it becomes a law within which a party may enforce his right."). It would plainly run afoul of this standard to apply the amended C.P.L.R. 214[6] in this case. Retroactive application of the amended provision would go further than merely depriving plaintiffs a reasonable time in which to file

their action; it would extinguish a claim that plaintiffs had already filed within the limitations period then applicable.

■ New York's earliest ruling prohibiting the retroactive application of a reduced limitations period to bar an otherwise timely claim occurred nearly 100 years ago. *See Gilbert,* 159 N.Y. 118, 53 N.E. 753. The *Gilbert* decision was seemingly grounded in the due process provision of the 14th Amendment to the United States Constitution. *Gilbert,* 159 N.Y. at 122–23, 53 N.E. 753. In recent times, New York's courts have simply repeated the *Gilbert* rule, typically as part of the legal boilerplate framing discussions of retroactivity, without analyzing its underpinnings and without assessing its continued vitality. In light of recent Supreme Court precedent, those state courts that have continued to cite *Gilbert* may be wrong in their unexamined assumptions regarding federal due process. *See Industrial Consultants, Inc. v. H.S. Equities, Inc.,* 646 F.2d 746, 749 (2d Cir.1981) ("The district court was not bound to adopt the Oklahoma court's interpretation of federal constitutional principles, even as applied to Oklahoma statutes.").

In its most recent discussion of retroactivity, the United States Supreme Court considered the evolving nature of due process in economic affairs, and determined that "the constitutional impediments to retroactive civil legislation are now modest." *Landgraf v. USI Film Products,* 511 U.S. 244, 272, 114 S.Ct. 1483, 1501, 128 L.Ed.2d 229 (1994).[3] The Court did suggest, however, that assorted Constitutional provisions, including the Contract Clause and the Due Process Clause, retain at least some role in matters of retroactivity. *Id.* at 266, 114 S.Ct. at 1497 ("antiretroactivity principles find expression in several provisions of our Constitution."). The Court need not determine whether, after

*Landgraf,* these "modest" constraints are enough to bar retroactivity in the circumstances of this case.[4] I find that the *Gilbert* rule is so firmly entrenched in state law that it is likely that New York's Court of Appeals will find that rule rooted in the state Constitution if necessary to preserve it. *See People v. Isaacson,* 44 N.Y.2d 511, 519, 406 N.Y.S.2d 714, 718, 378 N.E.2d 78, 82 (1978) (New York's due process clause "may impose higher standards than those held to be necessary by the Supreme Court under the corresponding Federal constitutional provisions."); *see generally* Marshall J. Tinkle, *Forward Into The Past: State Constitutions And Retroactive Laws,* 65 Temp. L.Rev. 1253 (Winter, 1992) (proposing application of state constitutions to bar retroactivity as a feasible way in which to deal with the perceived inequity permitted under the modem federal approach).

The rule announced in *Gilbert* is routinely incorporated by New York's courts into discussions of retroactivity. *See, e.g., O'Connor,* 509 N.Y.S.2d at 473; *Alston,* 639 N.Y.S.2d at 360; *Glod,* 546 N.Y.S.2d at 754; *McGuirk,* 501 N.Y.S.2d at 478; *Dunkum,* 256 N.Y. at 285, 176 N.E. 392. The state's leading legal treatises have followed suit, incorporating this rule into their description of the state's black letter law on retroactivity. *See, e.g.* 75 N.Y.Jur.2d 48 (1989) ("a reasonable time must be allowed after the effective date of the amended or new statute ..."); McKinney's Cons.Laws of N.Y., Book 1, Statutes § 59 ("Where a statute of limitations shortens the time for the enforcement of an existing right the Legislature must nevertheless afford the parties a reasonable time in which to prosecute their claims ..."). In recent decisions, coming after *Landgraf,* trial courts have relied upon *Gilbert* and declined to enforce amended limitations periods

---

**3.** Though finding that the Constitution seldom bars retroactivity in the civil context, the *Landgraf* Court did preserve a strong presumption against the retroactive application of substantive provisions, and of certain procedural provisions, as well. 511 U.S. at 278–79, 114 S.Ct. at 1504. As discussed in Section IB1, *supra,* New York maintains a similar presumption, which has been defeated with respect to C.P.L.R. 214[6].

**4.** The Second Circuit recently declined to reach a similar issue. *See Vernon v. Cassadaga Valley Central School District,* 49 F.3d 886, 889 n. 1 (2d Cir.1995) (applying amended limitations period to actions which accrued before the amendment, but not "address[ing] the situation where Congress replaces a statute of limitations with a shorter one that, if applied to a claim filed after the statute becomes effective, cuts off a plaintiffs right to sue without providing him an opportunity to comply with the new period.").

against litigants whose actions were otherwise timely filed. *See, e.g. Alston,* 225 A.D.2d 424, 639 N.Y.S.2d 359. In fact, the two decisions addressed specifically to the applicability of C.P.L.R. 214[6] to pending actions, though diverging in result, each reasoned that the retroactive application of the provision would violate the Constitution. *See Garcia,* N.Y.L.J. 26; *Russo,* N.Y.L.J. 29.[5]

These numerous expressions of state law counsel against retroactivity in the circumstances of this case. The fact that the *Gilbert* rule is still invoked—even after *Landgraf*—suggests that the New York courts continue to view it as antithetical to long-held notions of equity and fairness to apply a revised limitations period retroactively to bar an action that was timely when filed. Thus, if forced to confront the potentially faulty assumption that federal due process justifies the continued operation of the rule first announced in *Gilbert,* the New York Court of Appeals can be expected to preserve that rule—if need be—by tieing it explicitly to the due process clause of the state constitution.

## II. Merits Of Plaintiffs' Claims

Defendants argue that plaintiffs' claims are substantively deficient. What plaintiffs have identified as malpractice, defendants contend, amounted simply to a series of reasonable decisions by defendants at the time they were made. Moreover, defendants maintain that plaintiffs cannot establish the "but for" causation necessary to sustain their cause of action under either a theory of breach of contract or malpractice. As to the alleged breach of fiduciary duty, relating to the supposed conflict of interest involving defendants and Paul Weiss, defendants argue that there were no actual conflicts, and that plaintiff is again unable to demonstrate causation.

Plaintiffs respond to defendant's motion by cross-moving for summary judgment with respect to two of their claims; i) the alleged malpractice arising out of the failure to present evidence of damages, and ii) the alleged breach of fiduciary duty based upon defendants' conflict of interest. As for their re-

maining allegations of malpractice, plaintiffs argue broadly—without any particular discussion of the allegations in the complaint—that there are triable issues which require that defendants' motion be denied.

### A. Malpractice & Breach of Contract

■ To prevail in a claim of legal malpractice, plaintiffs must establish: "(1) the existence of an attorney-client relationship; (2) negligence on the part of the attorney or some other conduct in breach of that relationship; (3) that the attorney's conduct was the proximate cause of injury to the plaintiff; and (4) that but for the alleged malpractice the plaintiff would have been successful in the underlying action." *Sloane v. Reich,* 1994 WL 88008, * 3 (S.D.N.Y. March 11, 1994) (citations omitted); *see also L.I.C. Commercial Corp. v. Rosenthal,* 202 A.D.2d 644, 609 N.Y.S.2d 301, 302 (2d Dep't 1994) ("It is well settled that a claim of legal malpractice requires proof that the defendant 'failed to exercise that degree of care, skill and diligence commonly possessed and exercised by an ordinary member of the legal community, that such negligence was the proximate cause of the actual damages sustained by the [plaintiff], and that but for the [defendant's] negligence, the [plaintiff] would have been successful in the underlying action' ") (citations omitted).

■ Plaintiffs' breach of contract theory depends upon much the same showing as does their malpractice claim. Plaintiffs are not alleging that defendants guaranteed any particular result in the arbitration. Instead, they are arguing that, by committing "numerous omissions and negligence," defendants failed to meet their contractual obligation to make their best efforts on plaintiffs' behalf. (Am.Comp.¶ 90.) Plaintiffs' contract and malpractice claims, "therefore, require identical proof of the deviation of the standard of care, causation, and damages." *See DaSilva v. Suozzi, English, Cianciulla & Peirez,* 165 Misc.2d 792, 797, 629 N.Y.S.2d 952, 955 (Sup.Ct. Queens County 1995), *rev'd on other grounds,* —— A.D.2d ——, 649

---

5. As discussed in Section IB1, *supra,* the *Russo* Court avoided the perceived retroactivity problem by improperly deferring to the legislature's

position that it was merely "reaffirming" the proper application of the original C.P.L.R. 214[6].

N.Y.S.2d 680 (1st Dep't 1996). Thus, whether framing their claim as breach of contract or attorney malpractice, plaintiffs must demonstrate the same thing, that defendants did not perform with the appropriate level of care, and that plaintiffs suffered damages as a result. *Id.*

### 1. Reasonable Professional Decisions

■ In their Amended Complaint, plaintiffs marshall several allegations in support of their malpractice claim. According to plaintiffs, defendants erred by agreeing to proceed before a single arbitrator, by not objecting to the particular arbitrator selected, by failing to cross examine an adverse witness, by failing to prepare their own witness, by failing to name Bear Stearns as a defendant, by failing to comply with the arbitrator's instruction that they present evidence as to damages, and by failing to highlight Section 10.16 of the Bear Stearns partnership agreement.[6] As defendants contend, however, none of these decisions—whatever the alternatives then available—can now give rise to a viable claim for attorney malpractice.

■ An attorney cannot be held liable for malpractice for reasonable discretion exercised during the course of a litigation. *See Rosner v. Paley*, 65 N.Y.2d 736, 738, 492 N.Y.S.2d 13, 14, 481 N.E.2d 553, 554 (1985) ("selection of one among several reasonable courses of action does not constitute malpractice."); *see also Hwang v. Bierman*, 206 A.D.2d 360, 614 N.Y.S.2d 51, 52–53 (2d Dept. 1994) ("Even where there may be several alternatives, the selection of one of many reasonable defenses does not constitute malpractice."). "An attorney . . . is not held to a rule of infallibility, and is not liable for an honest mistake of judgment where the proper course of action is open to reasonable doubt." *DaSilva v. Suozzi, English, Cianciulli*, —— A.D.2d ——, 649 N.Y.S.2d 680, 683 (1st Dep't 1996) (citations omitted). Plain-

tiffs' kitchen sink approach cannot overcome this basic restraint on a claim of malpractice. None of the identified "errors" by defendant in connection with the unsuccessful arbitration were nearly so egregious that they could now be considered as unreasonable or otherwise sufficient to sustain a claim for malpractice.

In their opposition papers, plaintiffs discuss few of their malpractice allegations, focusing almost exclusively upon their claim that defendants disregarded the arbitrator's clear warning that testimony was required to establish the appropriate measure of relief. In one exchange, Mr. Finley indicated · that he found "nothing in the record so far to establish" Mr. Re's requested damages. (Arbitration Hearing Tr. at 209.) Near the end of the proceedings, Mr. Finley reiterated his concern:

> Arbitrator: But the thing I fail to see here, and I am telling this to you: assuming hypothetically that the preponderance is with the petitioner, I still haven't got evidence of the money question. Which you said you're going to cover in your brief.

> Mr. Wexler: Yes. Well, the evidence is in documentary fashion, and we will explain it to you in the brief.

> Arbitrator: I haven't seen anything on the record. Now I would like to suggest to you that you go through the record tonight, if you can, before these hearings close and point out in the record which items in the exhibits are the ones you refer to. Because every one of them can't be referred to.

> \* \* \* \* \* \*

> Arbitrator: I am not being critical. Other than a statement of $ 3,517,371 and a speculative million which comes to $ 4,517,371, I haven't heard a word of evidence in the record so far other than you say it's in the documents, nothing on the record.

---

6. The discussion in this section excludes the alleged conflict of interest, which plaintiffs do not frame as part of the alleged malpractice, but raise separately. as an alleged breach of fiduciary duty. *See* Section IIB, *supra.* By proceeding in this manner, plaintiffs avoid application of the rigorous "but for" standard to the claimed con-

flict of interest, which they cannot meet, and need only establish that defendants' relationship with Paul Weiss was a "substantial factor" in Mr. Re's defeat at arbitration. *See Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir.1994).

Maybe they are incorporated by reference into the record. I don't know.

Mr. Wexler: That's because there just aren't witnesses who can talk to that issue, and it has to be in documentary form.

Arbitrator: Maybe God knows, I don't know. Someone's got to know. It's got to be established, documentary or otherwise.

Mr. Wexler: That's right, we will walk you through it in the brief.

(*Id.* at 389–390.) Plaintiffs view such exchanges as clear indications that Mr. Finley instructed defendant Wexler to put on testimony on the damages question, and that defendant Wexler unreasonably resisted doing so.

Defendants view these exchanges differently, arguing that the arbitrator never indicated that defendant Wexler should call a witness on damages, but only that damages would have "to be established, documentary or otherwise." (*Id.*) When Mr. Finley said that he had seen "nothing in the record" indicating an appropriate measure of relief, defendant Wexler assured him that defendants would "prove damages through the documents [they had] obtained in discovery". (*Id.* at 209–10.) Mr. Wexler responded that this was "fine." (*Id.*) Even towards the end of the proceedings, when Mr. Finley was most obviously troubled by the damages issue, he indicated that his mind was "wide open," and confirmed defendants' intention "to cover [the damages question] in [their] so-called brief." (*Id.* at 388.)

It is entirely possible that defendants misread Mr. Finley's comments, and that the arbitrator was expressing considerable skepticism as to whether a post-hearing brief would be sufficient to persuade him on the appropriate measure of relief. Plaintiffs have not, however, demonstrated either that defendant Wexler's fear of ruinous cross examination of a damages expert was unfounded, or that Wexler's decision to rely upon documentary evidence was unreasonable. Indeed, defendants did not ignore the damages element of Mr. Re's claim; they argued the point in the post-hearing brief, as they had set out to do, with the arbitrator's apparent approval. Defendants' approach may not have been optimal, but plaintiffs have not proffered any evidence from which a trier of fact could conclude that defendants' choice was malpractice.

As part of the flurry of correspondence to the Court following full briefing on the summary judgment motions, plaintiffs devoted significant attention to their position that defendants were not "rigorous" enough in arguing that Mr. Re should prevail under Section 10.16 of the Bear Stearns' partnership agreement. (Ltr. from Detiere to the Court of 11/26/96.) According to this provision:

> If, after the final payment of his Capital is made to a Withdrawing Partner ... an asset of the Partnership ... shall become known and liquidated, the Withdrawing Partner shall receive that share of such asset to which he was entitled (directly or indirectly) during the period or periods to which the asset is attributable.

(*Id.*) Plaintiffs view this provision as "compelling," securing Mr. Re's rights with respect to the public offering. Defendants respond by identifying a number of difficulties with any argument based upon Section 10.16. For instance, it is not clear that Bear Stearns' decision to go public would qualify as an "asset." Also, defendants disagree with plaintiffs' understanding that Section 10.16 entitles partners to a share in any asset liquidated "after the final payment of [their] Capital." The more reasonable interpretation, in defendants' view, is that a partner can recover a share of any such asset "to which he was entitled" during the time that he was active. As with Mr. Re's other claims, according to defendants, it would be difficult to prove that the decision to go public would be "attributable" to any period during which Mr. Re remained a partner. (Ltr. from Warner to the Court of 12/20/96, at 5.)

It is somewhat curious that plaintiffs waited so long to argue that defendants committed malpractice by waiting too long in invoking Section 10.16. In any event, defendants did make the very argument that plaintiffs now say should have been made. In hindsight, it is easy enough to reason that the presentation should have been different, but

there is no evidence suggesting that it was malpractice that it was not. Defendants have identified numerous considerations which reasonably led them to conclude that any greater reliance upon Section 10.16 would be imprudent. In short, plaintiffs' hindsight determination that defendants' were not "rigorous" enough or quick enough in advancing the disputed position is precisely the sort of "second-guessing of counsel's strategic judgment ... [that] do[es] not rise to the level of legal malpractice." *Pacesetter Communications Corp. v. Solin & Breindel, P.C.*, 150 A.D.2d 232, 541 N.Y.S.2d 404, 406 (1st Dep't 1989).

With respect to the remaining allegations of malpractice set forth in their Amended Complaint, plaintiffs have given only cursory resistance to defendant's arguments for summary judgment. Plaintiffs simply recount the facts of a litany of cases cited in defendants' brief in support of summary judgment, and conclude that these cases "should require no further discussion." (Opp. to Mot. for S.J. at 31–32.) Plaintiffs are at least partly correct, defendants' cited authority is decisive. An attorney's reasonable decisions relating to such matters as cross-examination, witness presentation, and brief writing are not subject to second guessing in an action for malpractice. *See e.g., Stroock & Stroock & Lavan v. Beltramini*, 157 A.D.2d 590, 550 N.Y.S.2d 337, 338 (1st Dept.1990) (rejecting malpractice claim based upon "counsel's decision to proceed before the courts rather than in arbitration"); *L.I.C. Commercial Corp.*, 609 N.Y.S.2d at 302 ("defendant's determination not to call the witness in the underlying action was clearly a reasonable strategic decision which did not constitute malpractice."). This is the sum of plaintiffs' allegations, and plaintiffs' malpractice claim must therefore be dismissed. *Id.*

### 2. Proximate Cause

 As already noted, "to recover for legal malpractice, it must be shown not only that the attorney was negligent, but also that 'but for' the attorney's negligence the plaintiff would have prevailed in the underlying action." *Pacesetter*, 541 N.Y.S.2d at 405; *see also Hanlin v. Mitchelson*, 623 F.Supp. 452,

456 (S.D.N.Y.1985) ("in order to prevail, plaintiff must demonstrate that but for the alleged acts of malpractice, she would have been able to recover or proceed in a manner other than that which actually occurred."); *Stroock*, 550 N.Y.S.2d at 338. Plaintiffs cannot demonstrate such "but for" causation.

Plaintiffs have all but conceded that certain of defendants' decisions, though criticized in the Amended Complaint, were not the cause of plaintiffs' damages. Most notably, plaintiffs no longer ascribe their defeat against Bear Stearns to defendants' selection of Mr. Finley as the sole arbitrator in the matter. In fact, plaintiffs have most recently determined that "Mr. Finley was actually a very competent and qualified arbitrator [and that] Mr. Wexler may well have been right that Mr. Finley was an excellent choice." (Detiere 5/26/96 Aff. ¶ 16). It is simply impossible to reconcile this position with the conclusion that defendants' selection of Mr. Finley was actionable malpractice leading to plaintiffs' defeat against Bear Stearns.

It is also unlikely that defendants' alleged failure to present sufficient evidence on the question of damages explains Mr. Finley's adverse decision. First, damages was only one component of Mr. Re's claim against his former partners. While it is true that Mr. Finley expressed clear concern as to the adequacy of defendants' evidence on this point, there is no indication that he was satisfied that defendants had met their burden of proof with respect to the remaining elements of Mr. Re's claims. During the proceedings, Mr. Finley never did anything more than hypothesize that Mr. Re had been treated unfairly. (Arbitration Hearing Tr. at 387 ("Arbitrator: I have no opinions yet ...").) Unless Mr. Finley was more firmly convinced, the damages question could not have effected his final determination.

Even if defendants had succeeded at proving the merits of Mr. Re's claims, it is not clear that any different presentation on the issue of damages would have been persuasive. It is simply impossible to know what would have happened had defendants followed the course now suggested by plaintiffs—that is, calling Mr. Re's accountant, Ms. Halpern, as a witness to testify on the

damages question. Plaintiffs have not explained how Ms. Halpern, or any other witness, would have succeeded at deflecting cross-examination on the issue of Mr. Re's worth to Bear Stearns. Though plaintiffs freely criticize defendants' handling of the damages issue, they have not addressed defendants' strategic concerns, and they have not proposed any compelling alternative approach.

The foregoing discussion is perhaps unnecessary after plaintiffs' November 26, 1996 letter to the Court. There, plaintiffs refer to Section 10.16 of the Bear Stearns partnership agreement as Mr. Re's "only hope" of success at arbitration. By implication, then, plaintiffs accept that Mr. Re's loss was not the result of any of the other alleged errors by counsel (*i.e.,* the failure of proof on damages, the selection of Mr. Finley, etc.). Plaintiffs have placed too much stock in Section 10.16, however: the Court cannot conclude that Mr. Re would have prevailed had defendants presented Section 10.16 even as "rigorously" as plaintiffs suggest. As already noted, there are significant uncertainties with respect to the appropriate application of that provision, and it is not at all clear that Mr. Finley could have been persuaded to apply it in Mr. Re's favor. *See* Section IIA1, *infra*. Moreover, defendants advanced the argument, merely declining to do so with the emphasis plaintiffs now deem appropriate. There is no evidence from which a trier of fact could infer that this same argument, rejected when set out in a page, would have been dispositive if delivered with a different gloss and with greater zeal.

Thus, plaintiffs can not establish that defendants' tactical decisions were unreasonable, and plaintiffs cannot establish that any mistakes that defendants might have made resulted in Mr. Re's defeat. For each of these reasons, plaintiffs cannot proceed with their claim of malpractice.

7. Defendants argue that plaintiffs have not identified an expert prepared to testify as to the appropriate standard of professional care, or as to proximate cause, and that plaintiffs are therefore precluded from advancing their claim alleging breach of fiduciary duty. However, plaintiffs have retained an expert, William Barrett,

## B. Breach of Fiduciary Duty

"[A]n attorney stands in a fiduciary relationship to the client." *Graubard Mollen Dannett & Horowitz v. Moskovitz,* 86 N.Y.2d 112, 118, 629 N.Y.S.2d 1009, 1012, 653 N.E.2d 1179, 1182 (1995). As such, an attorney is "charged with a high degree of undivided loyalty to his client." *Kelly v. Greason,* 23 N.Y.2d 368, 375, 296 N.Y.S.2d 937, 244 N.E.2d 456 (1968). In the event that defendants breached this duty of loyalty, plaintiffs are "not required to meet the higher standard of loss or proximate causation." *Northwestern National Ins. v. Alberts,* 769 F.Supp. 498, 506 (S.D.N.Y.1991). Instead, to prevail on their claim of breach of fiduciary duty, plaintiffs must demonstrate a conflict of interest which amounted merely to a "substantial factor" in their loss at arbitration.[7] *See Milbank, Tweed, Hadley & McCloy v. Boon,* 13 F.3d 537, 543 (2d Cir.1994).

### 1. Conflict of Interest

Plaintiffs argue that defendants' relationship with Paul Weiss posed a conflict of interest such that, at a minimum, defendants were under an obligation to inform Mr. Re of their association with their former firm. There are two aspects to defendants' relationship with Paul Weiss which give rise to plaintiffs' concerns. First, Kornstein Veisz is something of a "spin-off" from Paul Weiss: all of the individual defendants worked as associates with Paul Weiss early in their careers. Next, defendants' relationship with Paul Weiss was not a thing of the past; defendants maintained economic ties with their former employer throughout the time that they represented Mr. Re against Bear Stearns.

### a. Defendants Status As Former Paul Weiss Associates

The Second Circuit has been called upon to determine whether a district court

who has submitted two affidavits to this Court assessing defendants' handling of the damages question. Since this issue lies at the heart of plaintiffs' allegations of defendants' "diminished rigor," the Court is satisfied, for now, with plaintiffs' proffer.

was correct in declining to disqualify an attorney based upon the fact that he was formerly an associate with a law firm opposing him in a particular matter. *See, e.g., Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 518 F.2d 751 (2d Cir.1975). During his time as an associate, the attorney in *Silver Chrysler* had even done some work for the opposing party in the litigation. Nevertheless, the Second Circuit agreed with the district court that disqualification was inappropriate. Reflecting upon the realities of large firm life, the Court found it unreasonable to assume that a junior associate with a large law firm would be privy to significant information concerning the affairs of any particular of the firm's clients. *See Silver Chrysler*, 518 F.2d at 753–54. It would therefore make little sense, in the Court's view, to "unnecessarily constrict[ ] the careers of lawyers who started their practice of law at large firms simply on the basis of their former association." *Id.* at 757. To the extent the realities of law firm life have changed since the holding in *Silver Chrysler*, they have changed in the direction of greater mobility by individual attorneys into and out of law firms. *See Graubard*, 86 N.Y.2d at 119, 629 N.Y.S.2d 1009, 653 N.E.2d 1179 (discussing the "current revolving door law firm culture"). In the present climate, it would be especially impractical to require that attorneys forever avoid representing clients in disputes involving their former firms.

Thus, the decision in *Silver Chrysler* confirms that defendants' former association with Paul Weiss does not, by itself, give rise to a conflict bearing upon their ability to represent Mr. Re. The decision in *Silver Chrysler*, however, does not speak to another matter of present concern. Defendants were not merely once associated with Paul Weiss; defendants maintained an ongoing relationship with their former firm throughout the time that they represented Mr. Re.

b. Paul Weiss Referrals

■ As New York's Court of Appeals recently explained, the attorney-client relationship requires an extraordinary degree of trust:

Sir Francis Bacon observed '[t]he greatest trust between [people] is the trust of giving counsel.' This unique fiduciary reliance, stemming from people hiring attorneys to exercise professional judgment on a client's behalf—'giving counsel'—is imbued with ultimate trust and confidence. The attorney's obligations, therefore, transcend those prevailing in the commercial market place. The duty to deal fairly, honestly and with undivided loyalty superimposes onto the attorney-client relationship a set of special and unique duties, including maintaining confidentiality, avoiding conflicts of interest, operating competently, safeguarding client property and honoring the clients' interests over the lawyer's.

*Matter of Cooperman*, 83 N.Y.2d 465, 471–72, 611 N.Y.S.2d 465, 467, 633 N.E.2d 1069, 1070 (1994) (citations omitted). As made emphatically clear by the Court in *Cooperman*, clients must be able to maintain extraordinary confidence in their attorneys, and attorneys must be unyielding in representing their clients with undivided loyalty.

■ The unique nature of the attorney client relationship requires that attorneys be sensitive not only to obvious conflicts, but also to forces that might operate upon them subtly in a manner likely to diminish the quality of their work. *See Kelly*, 23 N.Y.2d at 376, 296 N.Y.S.2d 937, 244 N.E.2d 456 ("the lawyer may not place himself in a position where a conflicting interest may, even inadvertently, affect, or give the appearance of affecting, the obligations of the professional relationship."). This is reflected, for instance, in Ethical Consideration (EC) 5–21 of Canon 5 of New York's Code of Professional Responsibility:

The obligation of a lawyer to exercise professional judgment solely on behalf of his client requires that he disregard the desires of others that might impair his free judgment. The desires of a third person will seldom adversely affect a lawyer unless that person is in a position to exert strong economic, political, or social pressures upon the lawyer. These influences are often subtle, and a lawyer must be alert to their existence. A lawyer subject-

ed to outside pressures should make full disclosure of them to his client . . .

These concerns are also given effect by operation of Disciplinary Rule (DR) 5–101(A): "Except with the consent of the client after full disclosure, a lawyer shall not accept employment if the exercise of professional judgment on behalf of the client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests."[8] In light of the factual record in this matter, it is possible that defendants were not adequately attuned to certain economic forces operating upon them, and that they were not sufficiently forthright in revealing these forces to Mr. Re.

While referrals from Paul Weiss constituted only a small fraction of defendants' overall business, the Court cannot say that the total dollars involved—on the order of $ 500,000 over several years—were insignificant. Indeed, a jury could reasonably conclude that this volume of referrals could have effected defendants' judgment in any action involving Paul Weiss, or that it might have left Paul Weiss in a position to exert considerable influence over defendants. Moreover, the record suggests at least some basis for supposing that such influence was brought to bear. Defendant Wexler relates that, during his meeting with Mr. Rubenstein, this Paul Weiss partner "tried to persuade" him that there was "no merit" to Mr. Re's claims. (Wexler 4/18/96 Aff. Ex. 30.) Though Mr. Wexler reported the substance of the meeting to Mr. Re, there is a factual dispute as to whether he reported the context. In other words, Mr. Wexler reported to Mr. Re that he had been urged by a likely witness that Mr. Re's claims lacked merit; but it cannot now be established that Mr. Wexler reported to Mr. Re that this likely witness was affiliated with a firm responsible for referring several hundred thousand dollars worth of business to Mr. Wexler and his partnership.

The Court recognizes that in most cases involving alleged conflicts of interest, there are law firms representing two sides to a dispute, or representing a client against a firm with which they have a relationship. *See, e.g. Kelly,* 23 N.Y.2d 368, 296 N.Y.S.2d 937, 244 N.E.2d 456 (upholding sanctions against members of two-partner law firm, where partners represented claimants against insurance carrier, though one of the partners worked as "outside adjuster" for that same carrier); *Cinema 5 Ltd. v. Cinerama, Inc.,* 528 F.2d 1384 (2d Cir.1976) (affirming disqualification of plaintiff's law firm whose partner was also a member of a firm simultaneously representing defendant in another matter "in other litigation of a somewhat similar nature."); *NCK Organization Ltd. v. Bregman,* 542 F.2d 128 (2d Cir.1976) (affirming disqualification of law firm representing "corporate officer against his former corporate employer when the firm and the client have both consulted with the former corporate house counsel on subjects at issue in the suit"). The Court recognizes further that many of the concerns animating decisions in such circumstances are not presently implicated. Most notably, defendants were not paid by Paul Weiss, and Paul Weiss was not representing Bear Stearns.

Despite these considerations, a number of factors gave rise to a possible conflict. Paul Weiss was the source of a significant income stream for defendants. Moreover, it was clear from the start of Mr. Re's relationship

---

**8.** "[T]he Code of Professional Responsibility [consists of] a series of nine canons promulgated by the American Bar Association and adopted by the New York State Bar Association. Each canon represents an expression of an axiomatic norm, and canons are further elucidated in Ethical Considerations and Disciplinary Rules. The ethical considerations (EC) are 'aspirational in character' and represent desired objectives; the disciplinary rules (DR) are, however, mandatory and violation of the rules may result in appropriate penalties." *Spilky v. Hirsch,* 102 Misc.2d 536, 425 N.Y.S.2d 934, 935 (1st Dept.1980). The Court draws upon New York's Code of Professional Responsibility to frame the appropriate standard of professional care. *Id.,* 425 N.Y.S.2d at 935 ("While the provisions of the code do not rise to the status of decisional or statutory law, 'the courts should not denigrate them by indifference.' ") (citations omitted); *see also Avianca, Inc. v. Corriea,* 705 F.Supp. 666, 679 (D.D.C. 1989) (The Disciplinary Rules of the American Bar Association's Code of Professional Responsibility . . . while not strictly providing a basis for a civil action, nonetheless may be considered to define the minimum level of professional conduct required of an attorney, such that a violation of one of the DR's is conclusive evidence of a breach of the attorney's common law fiduciary obligations."), *aff'd* 70 F.3d 637.

with defendants that Paul Weiss would figure prominently in any action by Mr. Re against Bear Stearns. Indeed, Paul Weiss was directly involved in the transaction that was at the vortex of Mr. Re's action, Bear Stearns' public offering. And, in meetings with both Mr. Re and defendant Wexler, Mr. Rubenstein unquestionably assumed the stance of an advocate for Bear Stearns. (Arbitration Hearing Tr. at 416 ("I told Mr. Re ... that if he brought a claim against Bear Stearns he would have to expect that it was going to be very rigorously defended, that this would not be settled, that they feel very strongly about it, they wouldn't pay a nickel, they were positive they did nothing wrong and I said and I will be a witness ...").) Paul Weiss thereby adopted a position adverse to Mr. Re. In sum, Paul Weiss was close to the situation involving Bear Stearns, and defendants were close to Paul Weiss; a reasonable jury could conclude that defendants should have alerted Mr. Re to their relationship with their former firm.[9]

Thus, there is a factual dispute as to defendants' alleged conflict of interest. The Court recognizes that this finding might unsettle the assumptions of some practicing attorneys who, undoubtedly well meaning, would never think to classify defendants' arrangement with Paul Weiss as problematic. These attorneys must bear in mind, however, that "[t]he standards of the profession exist for the protection and assurance of the clients and are demanding." *Gabri v. County of Niagara*, 127 Misc.2d 623, 486 N.Y.S.2d 682, 685 (Niagara County 1985). This Court is simply unable to tell plaintiffs that they are misguided in their frustration, that there was no problem posed by the fact that Mr. Re's attorneys—in a costly action against Bear Stearns—were former colleagues of, and were still associated with, Bear Stearns' long time legal counsel, a firm represented by an adverse witness at the proceedings. This scenario creates the risk of a conflict, and on the evidence before the Court, there is at least some evidence from which a jury could reasonably infer that such a conflict actually materialized.

### 2. Substantial Factor

█ In contrast to their malpractice claim, plaintiffs need not demonstrate that defendants' alleged breach of fiduciary duty was the proximate cause of Mr. Re's defeat at arbitration. *See Milbank*, 13 F.3d 537; *see also ABKCO Music, Inc. v. Harrisongs Music Ltd.*, 722 F.2d 988, 995–96 (2d Cir. 1983) ("An action for breach of fiduciary duty is a prophylactic rule intended to remove all incentive to breach—not simply to compensate for damages in the event of a breach."). The causation requirement is appropriately relaxed with respect to an alleged breach of fiduciary duty, particularly in the attorney client context, "because of the attorney's unique position of trust and confidence." *Id.* at 543. In order to establish causation, then, plaintiffs need only demonstrate that the defendants' alleged breach of fiduciary duty was a "substantial factor" in Mr. Re's loss at arbitration. *Id.*

Though there is insufficient evidence to establish the "but for" causation necessary for malpractice, the "substantial factor" standard—"prophylactic" in nature—invites a more generous evaluation of plaintiffs' claims. *See Milbank Tweed*, 13 F.3d at 543; *see also ABKCO*, 722 F.2d at 995. Viewed through the lens of a potential conflict of interest, defendants' otherwise defensible tactical decisions take on a more troubling

---

**9.** The Court is untroubled by the "absurd consequences" that defendants predict to follow from a ruling against them. (5/3/96 Motion For Summary Judgment at 36.) Defendants focus upon the following scenario: "If Firm A decides that it should not handle a litigation matter for a client because a lawyer at Firm A may be a witness, the matter will be referred to Firm B. Under plaintiffs' theory, unless Firm B discloses to the client every penny Firm B ever received from clients referred from Firm A ... Firm B will be liable if it loses the litigation." *Id.* This simply is not the case. Firms need not provide clients with an accounting of "every penny" derived from referrals from all potentially adverse firms and parties; attorneys are simply advised to alert clients to the general nature of their economic involvements with entities likely to play a prominent, adverse role—perhaps as a witness—in their client's affairs. In defendants' hypothetical, having been referred from Firm A to Firm B, a client could be expected to surmise that Firm B was in the practice of receiving referrals from Firm A. Mr. Re, on the other hand, was not in a position to make any such assumptions.

gloss, and suggest at least the possibility that defendants' divided loyalties substantially contributed to Mr. Re's defeat at arbitration. As plaintiffs contend, defendants might have been reluctant to disparage Paul Weiss, and, as a result, defendants may have pursued Mr. Re's claims with diminished rigor. *See Kelly,* 23 N.Y.2d at 377, 296 N.Y.S.2d 937, 244 N.E.2d 456. Such diminished rigor would have manifested itself in a number of poor choices which, taken together, substantially undercut Mr. Re's chances of success against Bear Stearns.

Without the specter of a conflict of interest, defendants' decision to delay any assessment of Mr. Re's damages until submission of the post-hearing brief was plainly defensible. Defendants might reasonably have feared that a damages expert would have faced harsh and effective cross examination. *See* Section IIA1. For present purposes, however, this explanation is unsatisfying. In preparing Mr. Re's case, it appears that defendants never fully analyzed the damages question. In advance of the proceedings, for instance, Mr. Wexler consulted Mr. Re's accountant, Ms. Halpern, but only briefly and without inviting her feedback as to the appropriate calculations bearing upon Mr. Re's partnership interest with Bear Stearns. (Halpern 4/26/96 Aff. ¶¶ 2, 3.) Early in the proceedings, Mr. Finley asked defendant Wexler some preliminary questions regarding the appropriate measure of relief, and Mr. Wexler struggled to articulate a cogent explanation of Mr. Re's losses. (Arbitration Hearing Tr. 46–53.) When Mr. Wexler finally did settle on a figure during this early questioning, it is one he subsequently revised downward, by a considerable margin, citing "mathematical errors" in his "preliminary notes." (Wexler 4/18/96 Aff. Ex. 21 at 91.)

As set out in the Court's discussion of the alleged malpractice, Mr. Finley—near the end of the arbitration proceedings—expressed his clear concern that there was an absence of evidence going to Mr. Re's damages. (Arbitration Hearing Tr. 386–90.) On what would become the last day of the proceedings, Mr. Finley urged Mr. Wexler, at a minimum, to spend the evening identifying those documents relevant to the damages analysis, and to designate those documents, on the record, before the formal close of the proceedings. (Arbitration Hearing Tr. at 389.) Mr. Wexler did not do so, apparently unwilling even to modify or supplement his plan to present the damages issue in a post-hearing brief. In his post-hearing brief, however, Mr. Wexler did not make nearly the use of documentary evidence that he had repeatedly assured Mr. Finley during the proceedings. (Barrett 4/24/96 Aff. ¶ 20.) In light of defendants' possible conflict of interest, and considering Mr. Wexler's seeming lack of full diligence on the damages question, a jury could reasonably conclude that his strategic decision not to present evidence or testimony as to damages during the proceedings was influenced by the conflict. Moreover, given Mr. Finley's obvious discomfort with the absence of any presentation on damages, it is at least possible that defendants' approach—though not a "but for" cause of Mr. Re's defeat—contributed to the arbitrator's ultimate rejection of Mr. Re's claims.

Another potential shortcoming in defendants' representation of Mr. Re involved Mr. Purpura, the only witness—aside from Mr. Re—called on Mr. Re's behalf As an initial matter, it appears that defendant Wexler, in combination with his associate, Mr. Fleming, never settled upon any coherent plan for developing Mr. Purpura's testimony. (Compare Arbitration Hearing Tr. at 280 ("Mr. Fleming: This all goes to ... assist in calculating our damages ..."), with Arbitration Hearing Tr. at 281 (Mr. Wexler: Could I interject ... We are not going to make any comparison between Mr. Re and Mr. Purpura ...").) Moreover, Mr. Purpura explains that defendant Wexler never spoke to him regarding the subject matter of his testimony. (Purpura 4/30/96 Aff. ¶ 3.) Mr. Wexler's discussions with Mr. Purpura were limited to questions concerning rumors that Mr. Purpura had heard concerning the timing of Bear Stearns' decision to go public, a matter not elicited during Mr. Fleming's examination of Mr. Purpura. While it might have been perfectly reasonable for Mr. Wexler to give an associate primary responsibility for preparing and questioning Mr. Purpura, it is somewhat curious that Mr. Wexler was not more attuned to the role being devised for the only

witness, besides Mr. Re, called on Mr. Re's behalf.

Mr. Wexler's failure to cross examine Mr. Rubenstein must also be revisited in light of the relationship between Paul Weiss and Kornstein Veisz. Undoubtedly, it is often times sensible to refrain from a cross examination. Wexler suggested at least a viable reason for his decision to do so—namely, Mr. Rubenstein's testimony was irrelevant under Mr. Wexler's theory of the case. However, given the relationship between defendants and Mr. Rubenstein's firm, this explanation now invites skepticism. It is possible, for instance, that defendants' very choice of arguments reflected a reluctance to challenge Paul Weiss during the proceedings.

In sum, the record permits the conclusion that Mr. Wexler's work on Mr. Re's behalf suffered on account of defendants' ties to Paul Weiss. The Court does not mean to suggest that defendants exhibited any bad faith, or that they meant to provide Mr. Re with anything less than vigorous counsel. It is possible, however, that defendants inadvertently relented to subtle financial pressures compromising their ability to work diligently on Mr. Re's behalf. Though Mr. Re's case was perhaps unlikely to succeed from the outset, it is plausible that a jury would conclude that defendants' failure to pursue that case vigorously was a "substantial factor" in Mr. Re's ultimate defeat. *See Milbank,* 13 F.3d at 543. For this reason, defendants' motion for summary judgment, as to the alleged breach of fiduciary duty, must be denied.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is granted in part, and denied in part, and plaintiffs' motion for summary judgment is denied. Specifically, the malpractice and breach of contract claims are dismissed, but plaintiffs can proceed to trial as to the alleged breach of fiduciary duty. A conference is scheduled for May 23, 1997, at 2:30 p.m., at which time the Court will schedule this matter for trial, unless the Second Circuit has by that time accepted this matter for interlocutory appeal.

The Court's decision to reject the retroactive application of the amended C.P.L.R. 214[6] raises special concerns. Though it is perhaps doubtful that the federal Constitution prohibits retroactivity in the circumstances of this case, for the reasons discussed, the Court is persuaded that New York's Court of Appeals would apply the state Constitution to achieve such a result. The New York Court of Appeals has not yet reached this question, however, and it is entirely possible that it will not ultimately adopt this Court's approach. There is a "substantial ground for difference of opinion" with respect to this issue. 28 U.S.C. § 1292(b). Moreover, because the question of retroactivity is potentially dispositive as to all of plaintiffs' claims, "an immediate appeal from this order may materially advance the ultimate termination of th[is] litigation." *Id.* Accordingly, the Court grants defendants' request and certifies this matter, solely as to the issue of retroactivity, for interlocutory appeal. The parties are to advise the Court in the event that the Second Circuit denies defendants' request for appeal prior to the next conference date.

**SO ORDERED.**