OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 This appeal focuses on a modern-day law firm fixture: the revolving door. With charges of faithless deserting partners and countercharges of a vindictive abandoned firm, the key question becomes whether departing partners can "solicit” clients of the firm. Here we decide only that plaintiff law firm’s allegations of breach of fiduciary duty, breach of contract and fraud are sufficient to withstand summary dismissal, which was the conclusion also reached by the trial court and Appellate Division.
 

 The following factual account is drawn largely from the assertions of plaintiff law firm, the nonmovant, and denied in material part by defendants. As alleged in the amended complaint, defendant-appellant Irving Moskovitz, along with Seymour Graubard, in 1949 founded plaintiff law firm. Over the next 40 years, the firm grew to 35 lawyers, with four senior partners — Graubard, Moskovitz, Raymond Horowitz and Emmanuel Dannett. Defendant Peter Schiller joined the firm in 1949 and became a partner in 1956; defendant John Young arrived in 1964 and became a partner in 1971. Control of the firm, however, was centered in the four seniors (who initiated most of the business), especially Moskovitz, the firm’s managing partner for 33 years, until 1982.
 

 
 *116
 
 In 1959, Moskovitz brought into the firm as a client F. Hoffman LaRoche & Co., Ltd. and affiliates (Roche), a worldwide pharmaceutical group headquartered in Switzerland. Legal services for Roche were mainly in the area of international taxation, Moskovitz’s specialty, although the firm also handled corporate and litigation matters for the client. In the late 1980s, billings to Roche exceeded $1 million per year.
 

 Concerned with developing a plan both for transition of management to the junior partners and for retirement of the seniors, the firm in 1981 retained an outside consultant and in 1982 adopted a "Phasing Out and Retirement Program.” The agreement provided for a three-year "phase-down” during which the four senior partners were to receive decreasing compensation percentages and a return of their capital, and then annual benefits for five years after their retirement. The retirement agreement included the following "Clarifications,” reading:
 

 ” 3. It is the spirit of the program that, during retirement, and even afterward, each of the retirees will not do anything to impair the firm’s relationship with its existing clients and business.
 

 "4. The partners recognize that efforts towards institutionalization of the business of the firm is essential to the firm’s continuing prosperity. In particular, the partners approaching phase-down and retirement will integrate, to the extent possible, relationships between the firm’s clients and the other partners.”
 

 At the time the agreement was presented, according to plaintiff, Moskovitz additionally assured the junior partners that the seniors would do all they could to secure the firm’s future and to institutionalize clients, particularly key clients, by integrating them with other partners in the firm. Some time after the agreement was approved in April 1982, however, Moskovitz approached Graubard and suggested starting a new partnership with Horowitz, a proposal Graubard rejected. Soon thereafter, the firm signed a $1.5 million lease on new office space and moved into its new quarters.
 

 At the end of the three-year phase-down, having received back his capital as well as compensation exceeding that provided in the retirement agreement, Moskovitz — then 73 years old — became "of counsel” to the firm. However, he soon became unhappy with the law firm and contacted legal search
 
 *117
 
 consultants (Alan Roberts & Associates) regarding a possible move, with his tax partners Schiller and Young, to another law firm. Moskovitz told Roberts that his client Roche would accompany him if it approved the new firm. On November 30, 1987 Roberts put Moskovitz in touch with LeBoeuf Lamb Leiby & MacCrae, a New York based firm, and a four-month negotiation ensued, culminating on April 29, 1988 in defendants’ announced resignation from plaintiff law firm to join LeBoeuf.
 

 According to plaintiff, LeBoeuf would not finalize any arrangement with defendants unless Roche approved the transfer of its business. Moskovitz likewise wanted to ensure that he would continue to represent Roche if he moved to LeBoeuf. In March 1988 Moskovitz asked Roche’s tax director whether the company had any objection to representation by LeBoeuf if he were to move there. Defendants’ meetings with Roche and with LeBoeuf became nearly contemporaneous: on March 4, defendants met with LeBoeuf partners at the Metropolitan Club and later that same week, Moskovitz met with Roche’s domestic general counsel. On at least one occasion, in April 1988, Moskovitz arranged for the head of LeBoeufs tax department to meet with Roche’s general counsel. Furthermore, plaintiff firm was engaged in settlement negotiations of a tax audit matter for Roche from late 1987 and continuing into the first quarter 1988 with potentially serious financial consequences. Moskovitz asked for and received assurances from a Roche executive that he would continue to handle the matter if he joined LeBoeuf.
 

 Defendants had planned to remain at the firm for two months beyond their announced resignation, continuing to draw their compensation, but one week later — on May 6 — the firm locked them out of their offices and sued them for fraud, breach of fiduciary duty, breach of contract and unjust enrichment, seeking damages exceeding $10 million based upon lost revenues of the Roche account and $30 million in punitive damages.
 
 [1]
 
 Defendants, consequently, began their association with LeBoeuf on May 9 and Roche immediately had its files transferred there.
 

 In late 1989, defendants moved for summary judgment and plaintiff cross-moved for summary judgment on its breach of
 
 *118
 
 fiduciary duty claim. The court denied the motions (149 Misc 2d 481), except to dismiss any claim which could be construed to be based on representations that Moskovitz would "guarantee the retention” of certain clients or on assertions that defendants did not have the right to leave the firm and to hold plaintiffs cross motion in abeyance pending further discovery. On renewal in 1992 the trial court denied summary judgment finding that there were material questions of fact. The Appellate Division affirmed and granted leave to appeal to this Court on a certified question. Only Moskovitz appeals; plaintiff has not pursued a cross appeal from the denial of summary judgment on its breach of fiduciary duty claim.
 
 [2]
 

 Analysis
 

 Urging that he be granted summary judgment, Moskovitz posits three issues:
 
 first, as a
 
 matter of public policy, is there a breach of fiduciary duty when a withdrawing partner, prior to announcing his resignation, "solicits” firm clients;
 
 second,
 
 is a contractual requirement that an attorney try to "integrate” or "institutionalize” clients into the firm legally enforceable; and
 
 third,
 
 is a cause of action for fraud stated by alleging that a promisor, at the time of making certain representations, lacked any intention to perform them. For the reasons that follow, we answer all three questions in the affirmative.
 

 Breach of Fiduciary Duty
 

 Both sides acknowledge the principle that law partners, no less than any other business or professional partners, are bound by a fiduciary duty requiring "the punctilio of an honor the most sensitive”
 
 (Meinhard v Salmon,
 
 249 NY 458, 464;
 
 see also, Duane Jones Co. v Burke,
 
 306 NY 172, 188-189). Both sides acknowledge as well the principle that an attorney stands in a fiduciary relation to the client
 
 (Matter of Kelly v Greason,
 
 23 NY2d 368, 375).
 

 Translating principles into practice, however, presents a far greater problem.
 

 
 *119
 
 Moskovitz insists that the venerable principle of fiduciary duty among law partners must in today’s marketplace give way to the higher value of attorney responsibility to clients: keeping them informed of matters that affect them, allowing them counsel of their choice, and incident to that choice assuring unrestricted attorney mobility. He emphasizes that he had a direct, personal relationship with Roche, as its lawyer, for more than 30 years and therefore had not simply a right but actually an affirmative obligation to tell Roche, particularly in the midst of a serious tax matter he was handling for the client, that he was considering joining another law firm and ascertain whether it might have a conflict of interest there — and he did no more than that.
 

 It is unquestionably difficult to draw hard lines defining lawyers’ fiduciary duty to partners and their fiduciary duty to clients. That there may be overlap, tension, even conflict between the two spheres is underscored by the spate of literature concerning the current revolving door law firm culture
 
 (see generally,
 
 Krane,
 
 Ethical and Professional Issues Associated with Departing Attorneys,
 
 printed in Employment Law and Human Resource Issues in Law Firms and Professional Partnerships, at 473 [1993]; Hillman,
 
 Law Firms and their Partners: The Law and Ethics of Grabbing and Leaving,
 
 67 Tex L Rev 1 [1988]; Johnson,
 
 Solicitation of Law Firm Clients by Departing Partners and Associates: Tort, Fiduciary and Disciplinary Liability,
 
 50 U Pitt L Rev 1 [1988]; Comment,
 
 Lateral Moves and the Quest for Clients: Tort Liability of Departing Attorneys for Taking Firm Clients,
 
 75 Cal L Rev 1809 [1987]; Withdrawal, Retirement and Disputes: What You and Your Firm Need to Know [Berger ed 1986]).
 

 One respected commentator opines that, while a departing partner’s preresignation negotiations with firm clients in most businesses would probably constitute breach of the common-law obligation of loyalty to the firm, in the case of law practice, "the public policy favoring client freedom of choice in legal representation should override the firm’s proprietary interest in holding its clientele” (Hazard,
 
 Ethical Considerations in Withdrawal, Expulsion, and Retirement,
 
 printed in Withdrawal, Retirement and Disputes,
 
 op. cit.,
 
 at 36).
 

 We agree with the trial court and Appellate Division, however, that as a matter of principle, preresignation surreptitious "solicitation” of firm clients for a partner’s personal gain — the issue posed to us — is actionable. Such conduct ex
 
 *120
 
 ceeds what is necessary to protect the important value of client freedom of choice in legal representation, and thoroughly undermines another important value — the loyalty owed partners (including law partners), which distinguishes partnerships (including law partnerships) from bazaars.
 

 What, then, is the prohibited "solicitation”? As the trial court recognized, in classic understatement, the answer to that question is not "self-evident” (149 Misc 2d, at 486).
 

 Given the procedural posture of the case before us, plainly this is not an occasion for drawing the hard lines. Factual variations can be crucial in determining whether an attorney’s duties have been breached, and we cannot speculate as to what conclusions will follow from the facts yet to be found in the case before us. We can, however, set out certain broad parameters, as the trial court did.
 

 At one end of the spectrum, where an attorney is dissatisfied with the existing association, taking steps to locate alternative space and affiliations would not violate a partner’s fiduciary duties. That this may be a delicate venture, requiring confidentiality, is simple common sense and well illustrated by the eruption caused by defendants’ announced resignation in the present case. As a matter of ethics, departing partners have been permitted to inform firm clients with whom they have a prior professional relationship about their impending withdrawal and new practice, and to remind the client of its freedom to retain counsel of its choice (New York County Lawyers Assn. Ethics Opn 679 [1991]; Assn of Bar of City of NY, Ethics Opn 80-65 [1982];
 
 see also,
 
 Johnson,
 
 Solicitation of Law Firm Clients by Departing Partners and Associates: Tort, Fiduciary and Disciplinary Liability,
 
 50 U Pitt L Rev, at 99-106). Ideally, such approaches would take place only after notice to the firm of the partner’s plans to leave
 
 (see,
 
 Davis and Glen,
 
 Practical Issues of Professional Responsibility: Musical Chairs: Key Issues When A Lawyer Makes a Lateral Employment Move,
 
 NYLJ, Nov. 26, 1990, at 1, col 1 [part I] and Dec. 20, 1990, at 1, col 2 [part II];
 
 Withdrawal and Termination
 
 No. 129, printed in ABA/BNA Lawyers’ Manual on Professional Conduct, at 91:720 [1993]).
 

 At the other end of the spectrum, secretly attempting to lure firm clients (even those the partner has brought into the firm and personally represented) to the new association, lying to clients about their rights with respect to the choice of
 
 *121
 
 counsel, lying to partners about plans to leave, and abandoning the firm on short notice (taking clients and files) would not be consistent with a partner’s fiduciary duties
 
 (see, Matter of Silverberg [Schwartz],
 
 81 AD2d 640, 641;
 
 Meehan v Shaughnessy,
 
 404 Mass 419, 535 NE2d 1255;
 
 Adler, Barish, Daniels, Levin & Creskoff v Epstein,
 
 482 Pa 416, 393 NE2d 1175,
 
 appeal dismissed and cert denied
 
 442 US 907).
 

 Although the trial court harbored the belief that discovery would facilitate resolution of this dispute as a matter of law, and therefore invited renewal of plaintiff’s cross motion for summary judgment, the volumes of depositions and affidavits have not in fact clarified the issues. With Moskovitz pointing to evidence that his preresignation conduct was nothing more than appropriate client informational service, and plaintiff law firm pointing to evidence that he was engaged in improper solicitation of Roche for his own benefit, no conclusion can be drawn at this juncture as to where on the spectrum this case falls. Plainly Moskovitz’s summary judgment motion was correctly denied.
 

 Breach of Contract
 

 Having concluded that there is an issue of fact with respect to the alleged breach of fiduciary duty, the same result follows as to the breach of contract claim, where the core of appellant’s legal challenge before us
 
 [3]
 
 — that the supervening public policy favors client freedom of choice — is essentially the same. The retirement agreement provision in issue in no way compromised the freedom of clients to choose their counsel or the freedom of appellant to practice law. The provision simply obliged the firm’s senior partners to use their "best efforts” to expose firm clients to the work of other attorneys in the firm, as they deemed appropriate, in the hope that, with retirement of the seniors on the horizon, such familiarity would breed longevity in the relationship.
 

 Given Moskovitz’s insistence that the client looked only to him, and would never have remained with the firm after his departure, whether the promised "best efforts” were in fact used is a disputed issue that must be determined at trial.
 

 
 *122
 
 Fraud
 

 Plaintiff’s cause of action for fraud — alleging that Moskovitz made false representations to the partnership prior to its approval of the retirement agreement with no intention of complying with those representations — similarly states a claim that survives summary judgment.
 

 A cause of action for fraud may arise when one misrepresents a material fact, knowing it is false, which another relies on to its injury
 
 (see, Ochs v Woods,
 
 221 NY 335, 338). A false statement of intention is sufficient to support an action for fraud, even where that statement relates to an agreement between the parties
 
 (Deerfield Communications Corp. v Chesebrough-Ponds, Inc.,
 
 68 NY2d 954, 956;
 
 Channel Master Corp. v Aluminium Ltd. Sales, 4
 
 NY2d 403, 406-407;
 
 Sabo v Delman,
 
 3 NY2d 155, 160; Prosser and Keeton, Torts § 109, at 763 [5th ed]).
 

 Plaintiff charges that Moskovitz represented orally to the partnership that he and the other seniors would act to ensure the future of the firm by integrating and institutionalizing the clients when he never intended to do so and indeed was even considering the formation of a new partnership. Although (as the Trial Judge recognized) plaintiff may ultimately have difficulty persuading a fact finder of its assertions by clear and convincing evidence, a cause of action has been stated. And as with the claims for breach of fiduciary duty and breach of contract, material fact issues preclude summary judgment.
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.
 

 Judges Simons, Titone, Bellacosa, Smith, Levine and Ciparick concur.
 

 Order affirmed, etc.
 

 [1]
 

 . Moskovitz points out that the Roche business sent to LeBoeuf quickly dwindled below the aggregate compensation paid defendants. By 1993, all three defendants had left LeBoeuf.
 

 [2]
 

 . While plaintiff now urges that this Court grant it summary judgment, we neither grant affirmative relief to a nonappealing party
 
 (see, Hecht v City of New York,
 
 60 NY2d 57, 61-62) nor have the power of the Supreme Court to search a record and award summary judgment
 
 (see, Merritt Hill Vineyards v Windy Hgts. Vineyard,
 
 61 NY2d 106, 111).
 

 [3]
 

 . Against challenges based on vagueness of the promise, the trial court concluded that, as a matter of contract law, a meaningful contractual promise of this kind could be made. That conclusion is not challenged before us.