2022 IL App (1st) 201292-U

FIRST DISTRICT,
FIRST DIVISION
September 19, 2022

No. 1-20-1292

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| MCNABOLA LAW GROUP, P.C., f/k/a Cogan & McNabola, P.C., MARK MCNABOLA, and EDWARD MCNABOLA, | ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | Appeal from the |
| MICHAEL COGAN, JOHN POWER, GREG MARSHALL, JON PAPIN, and COGAN & POWER, P.C., | ) ) ) | Circuit Court of Cook County, Illinois. |
| Defendants | ) | No. 2015 L 002120 |
| | ) | |
| (McNabola Law Group, P.C., f/k/a Cogan & McNabola, P.C., | ) ) | Honorable Daniel J. Kubasiak, |
| Plaintiff-Appellant, | ) | Judge Presiding. |
| v. | ) | |
| | ) | |
| Michael Cogan, John Power, Greg Marshall, and Cogan & Power, P.C., | ) ) | |
| Defendants-Appellees). | ) | |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Justices Pucinski and Hyman concurred in the judgment.

**ORDER**

¶ 1    *Held*: Law firm filed suit against former partners. Trial court granted partial summary judgment to defendants on breach of fiduciary duty claims. We affirm, finding (1)

there was no evidence that defendants engaged in pre-termination solicitation of clients or of each other to leave the firm, and (2) departing attorney did not have a fiduciary duty to inform firm that his coworker was leaving.

¶ 2        Plaintiff McNabola Law Group, P.C. ("MLG") sued, among others, former partners Michael Cogan and John Power, who resigned from MLG on July 2, 2012 to practice at their new firm, defendant Cogan & Power, P.C. ("C&P"). MLG alleged that Cogan and Power breached their fiduciary duties to MLG by soliciting MLG's clients and "orchestrat[ing]" a "mass exodus" of MLG attorneys and staff prior to their resignation. The trial court granted partial summary judgment to defendants on the breach of fiduciary duty claims. MLG appeals pursuant to Supreme Court Rule 304(a) (Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016)). For the reasons that follow, we affirm.

¶ 3                                    BACKGROUND

¶ 4        In 1992, defendant Michael Cogan and plaintiff Mark McNabola ("Mark") founded MLG (then known as Cogan & McNabola, P.C.) as 50/50 shareholders in a law firm specializing in personal injury actions. In 2001, defendant John Power was hired as an associate and later promoted to non-equity partner. In 2007, Edward McNabola (Mark's younger brother, henceforth "Ted") joined the firm as an equity partner. Ted received a 17% ownership interest, and Cogan and Mark's respective interests were reduced to 41.5%. Mark was the managing partner of MLG from "at least" 2008 onward.

¶ 5        Prior to 2008, MLG's revenues were split equally between Cogan and Mark, but "as time passed" Mark objected to that arrangement as "[n]ot fair and not an efficient way to run a firm." Shortly after Ted joined MLG, the firm implemented a revenue allocation agreement, effective January 1, 2008 (the 2008 Agreement), that allocated 49% of the firm's profits to Mark, 34% to Cogan, and 17% to Ted.

¶ 6        In November 2010, Mark and Ted, representing MLG's majority, approved a new revenue allocation agreement (the 2010 Agreement) over Cogan's objection. The 2010 Agreement abandoned the percentage system for allocating profits, divided the firm into two operating units (referred to as "[t]wo units doing business as one brand"), and allocated revenues and expenses separately to each unit. The units were the McNabola Unit, led by Mark and Ted, and the Cogan Unit, led by Cogan, which employed Power. Mark characterized the units as "divisions in the firm." Ted described the relationship between Mark and Cogan as "tense" and recalled that during the board meeting at which the 2010 Agreement was approved, Mark accused Cogan of being a "fraud" and of "defrauding the company."

¶ 7        Cogan believed the 2010 Agreement effectively turned MLG into "two *** competing law firms" and fostered "acrimony" and "toxicity" between the units. He felt he had been "excommunicated from half the firm" and by late fall 2010, he "hated coming to work every day." In late 2010 to early 2011, Cogan began to "explore [his] options" regarding office space separate from MLG but "wasn't serious about making a move" and eventually stopped searching. Power was aware of Cogan's efforts but stated in his deposition he was not party to them and requested not to be copied on emails relating to the search. Around this time, Power told Cogan he was dissatisfied with "this dysfunctional, toxic firm" and said that "he didn't know *** whether he was in for the long run." Cogan told Power to "hang in there" and that he would be "taking action" to "undo the harm that Mark and Ted had done to the firm" or, alternatively, to dissolve the firm.

¶ 8        In August 2011, Cogan initiated an arbitration proceeding against MLG, Mark, and Ted, challenging the validity of the 2010 Agreement and seeking distribution of the firm's revenue according to the 2008 Agreement. Cogan also sought dissolution of the firm based on allegations

of oppression of a minority shareholder (himself), breach of fiduciary duty, and conversion. Power was not a party to the proceeding but provided testimony in which he criticized the management of the firm and supported Cogan's allegation that Mark's conduct was oppressive.

¶ 9        During and after the arbitration proceeding, Power was in a dispute with Mark over a $60,000 discretionary bonus from the McNabola Unit. Mark initially promised Power the bonus but "took it back" because he "felt betrayed" by Power's testimony at the arbitration hearing. In December 2016, Power brought suit against MLG to collect the $60,000 bonus, and Mark eventually settled with him for $55,000. In his deposition, Mark acknowledged that reneging on his promise to pay the bonus was "a mistake."

¶ 10        On March 5, 2012, the arbitrator ruled that the 2008 Agreement was not properly terminated for the year 2010 and remained in effect for that year, with the 2010 Agreement taking effect on January 1, 2011. As to Cogan's claims of oppression, the arbitrator stated that "the Firm is being operated in a dysfunctional manner" and the "apparent enmity between the parties" was "disheartening," but "[did] not find the dysfunctionalism to constitute oppression warranting dissolution." The arbitrator modified the 2010 Agreement to split associate profits equally between the McNabola and Cogan Units (they were previously split 60/40 in favor of the McNabola Unit). The arbitrator also ruled:

> "During the hearing Mr. Cogan was asked his opinion on what would happen if he left the Firm in terms of 'unfinished business'. He was under the impression that the results of the cases would continue to belong to the Firm.
>
> Since it is a given that clients decide who their lawyer should be, and any accounting back to the Firm creates a disincentive that prejudices the client, it will be the

ruling *** that, in the event any parties leave the Firm, they may take those cases which the clients desire be transferred with no right back to the Firm.

***

In the event a party leaves the Firm, it will be the client's choice whether the case stays or goes with the departing party. However, where such cases go with the departing party, there is no obligation back to the Firm to share part of the fee. Nor will the departing party have any right to fees for cases left behind."

¶ 11    Cogan first discussed forming a law firm with Power "within days" of the arbitration ruling. Cogan testified in his deposition that "[a]fter interpreting the ruling I said, 'I'm out of here.' And [Power] said, 'So am I.' " Between March and June 2012, Cogan and Power took steps to set up a new law firm, Cogan & Power, P.C. (C&P). According to Power, they "kept it private" that they were leaving because they were concerned that if they informed Mark of their plans, Mark would "call the clients and say things that weren't true *** and then interfere with the ability to represent the clients effectively and truthfully."

¶ 12    On July 2, 2012, between 8:45 a.m. and 8:50 a.m., Cogan and Power resigned from MLG to practice at C&P. Within "a day or two," multiple other MLG employees, including paralegal Greg Marshall, resigned to join C&P, and by July 9, "almost 75 clients had terminated [MLG] and joined Cogan and Power."

¶ 13    On March 3, 2015, MLG brought the instant suit against Cogan, Power, C&P, and Greg Marshall. In the second amended complaint, MLG sought relief in seven counts, of which counts I to III are at issue in this appeal.[1] Count I alleged that Cogan and Power breached their fiduciary duties of loyalty, good faith, and fair dealing toward MLG as follows:

---

[1] The second amended complaint also asserts various claims by Mark in his personal capacity, including a claim against former MLG associate Jon Papin, none of which are relevant to this appeal.

"(a) Either Cogan solicited Power to form a new law firm or Power solicited Cogan to form a new law firm.

(b) Cogan failed to notify either [Mark] or [Ted] that Power was planning on leaving [MLG].

(c) Cogan and Power solicited [MLG] employees to leave [MLG].

(d) Cogan and Power both solicited Cogan and Power's clients to terminate [MLG] and to join with them at [C&P]."

The complaint further alleged that Cogan and Power encouraged MLG associate Jon Papin to solicit his clients for C&P and directed Marshall to misappropriate confidential information, including client files.

¶ 14    Count II alleged that Marshall "aided and abetted Cogan and Power in connection with the breach of the fiduciary duties that Cogan and Power owed to the McNabola firm." Marshall was "particularly knowledgeable" about MLG's document management systems and allegedly "assisted Cogan and Power with the establishment of [C&P]" by transferring client files and case files to C&P before those clients retained C&P. Count III alleged that Cogan, Power, C&P, and Marshall were engaged in a "conspiracy to breach fiduciary duties" based on the factual allegations in counts I and II.

¶ 15    On September 20, 2019, defendants moved for partial summary judgment on counts I, II, and III, arguing that MLG's breach of fiduciary duty claims were "factually and legally unfounded" and that Cogan and Power's pre-resignation activities were "preliminary logistical steps" that Illinois courts have "expressly found appropriate in planning to leave a law firm." Defendants stated that MLG had no evidence that Cogan solicited Power to leave, and the record

established that Power independently decided to leave due to dissatisfaction with the firm. Furthermore, Cogan and Power had no obligation to inform MLG of their intention to resign.

¶ 16    Defendants also argued that MLG's allegations of client solicitation were unfounded since the record established that Cogan and Power solicited clients only after they resigned. In their November 1, 2017 response to defendants' requests to admit, plaintiffs stated they were not aware of any oral conversations and did not have any documents dated prior to July 1, 2012 in which Cogan or Power solicited a MLG client to leave the firm. Mark and Ted additionally conceded in their depositions they had no knowledge of pre-resignation solicitation of clients.

¶ 17    In its response, MLG alleged that (1) Cogan solicited Power in that he "initiated the conversations with Power regarding leaving the Firm"; (2) Cogan had an affirmative duty to inform MLG that Power planned to leave; and (3) if informed of Power's plans, Mark and Ted could and would have incentivized Power to stay. MLG additionally alleged that after November 1, 2017, it discovered new evidence of pre-resignation client solicitation in the *Begum* and *Ayoola* cases, and that Power withheld information from the firm regarding Moskvine, a potential client.

¶ 18    Begum

¶ 19    Begum was a client of MLG starting in 2010. Her case was primarily handled by Power, the only MLG attorney with whom she had contact. On July 5, 2012, she transferred her case to C&P. In September 2012, she discharged C&P due to dissatisfaction with Power's representation.

¶ 20    On November 15, 2019, Begum wrote an affidavit stating:

> "During mid-June 2012, I received a call from John Power on a number different than his cell phone. *** During this call, John Power informed me that he was leaving

[MLG] and setting up a new office because [MLG] was an unfair and dishonest company. He also explained that my case file would go with him because he was the only attorney I knew at [MLG], he knew my case the best and he had helped me find the doctors I needed. He told me that I would need to sign something to transfer my case and not to call him at the [MLG] office anymore."

She further averred that on July 5, 2012, she received and executed a written transfer letter to transfer her case to C&P. She subsequently met with Power at his C&P office where he repeated that he left MLG because it was "unfair and dishonest."

¶ 21    MLG argued that Power's June 2012 phone call constituted solicitation, and "[i]t is reasonable to believe that Ms. Begum is not the only person that Power solicited prior to his resignation. Indeed, there is a reasonable inference that Power contacted all of the Firm clients whom he had represented."

¶ 22                                    Ayoola

¶ 23    *Ayoola* was MLG's largest case prior to Cogan and Power's departure. Mark originated the case and was lead counsel. Jon Papin, an associate in the McNabola Unit, was assigned to the case. Cogan and Power did not perform any work on the case at MLG.

¶ 24    Mediation of *Ayoola* was scheduled for June 14, 2012. Prior to the mediation, Mark advised Papin that he would not be participating and ordered him not to have any contact with the Ayoolas. In a June 6 letter to Mark, Papin acknowledged that he knew he was being fired.

¶ 25    On June 13, between 9 and 11 p.m., there was "telephone traffic among Papin, [Cogan], [Power], and Ayoola." Specifically, there were multiple phone calls between Cogan and Power; between Power and Papin; between Papin and Mrs. Ayoola; and a call from Papin to Laura

O'Keefe, a MLG paralegal who was attending the mediation the next day. (It is not alleged that Cogan or Power ever directly spoke to either of the Ayoolas.)

¶ 26        In his deposition, Papin acknowledged having multiple telephone conversations with Mrs. Ayoola from June to July 5, 2012. He stated that in May 2012, Mrs. Ayoola "chastised" him for not returning her phone call. Papin told her that he had "a falling out with Mark," and she replied: "Listen, you are our lawyer until I tell you otherwise. You—when I call you, you return my phone calls. I want to know what's going on in my daughter's case." Mrs. Ayoola called Papin "numerous times" thereafter, and he explained the mediation process to her and kept her apprised of developments in the case.

¶ 27        O'Keefe testified in her deposition that she was assigned to attend the mediation on the afternoon of June 13 and spoke to Papin that evening about "salient points that he wanted to hammer home" in the mediation. O'Keefe was not aware of any attempts by Cogan or Power to solicit *Ayoola*.

¶ 28        Papin's last day at MLG was June 30. That evening, Papin attended a charity dinner with Cogan and Power. On July 2, after Cogan and Power resigned from MLG, Papin was offered and accepted a job at C&P. On July 5, the Ayoolas transferred their case to C&P. Papin testified that he never discussed the Ayoolas "coming with him" to C&P until July 5. Cogan testified in his deposition that he had no information about the *Ayoola* case until it was transferred. MLG nevertheless argued that "[i]t is hard to imagine better evidence of the solicitation of the Ayoolas by Cogan and Power, through Papin, than this late-night-the-day-before-the-mediation exchange of telephone calls."

¶ 29        On June 7, 2019, the trial court entered partial summary judgment in favor of defendants on MLG's claim for damages relating to the *Ayoola* case, finding the claim "barred by the terms

of the *Ayoola* court's April 20, 2016 opinion, which was also incorporated by reference into the settlement agreement between MLG and C&P that released any claim for attorneys' fees arising from or related to the *Ayoola* matter." MLG does not contest that ruling in this appeal.

¶ 30                                    Moskvine

¶ 31        In June 2012, Anatoli Moskvine was in the intensive care unit after "serious complications" in surgery. His girlfriend Natalia called Power, who told her that to investigate a potential cause of action he would need to speak with either Anatoli or one of his family members. On June 12, 2012, Anatoli's daughter Elena sent Power an email via FindLaw, a service to which MLG subscribed that forwards prospective clients to law firms. That evening, Power sent Elena an email stating that he tried contacting her by phone and was not able to leave a voicemail.

¶ 32        Elena subsequently called Power back and arranged a face-to-face meeting that took place prior to Power's resignation. Power explained the malpractice system and that a contingent fee would be charged. Elena thanked him for the information and said she would call him back "if she was interested in doing anything." She did not contact him again until "November or December," by which point Power had left MLG and started the C&P firm. C&P accepted the case, which eventually settled for $7 million.

¶ 33        Power testified in his deposition that he did not inform Mark or Ted of his conversation with Elena because "[t]here was nothing to follow up on at that point. I talked to the daughter. She said if they were interested in contacting us again, they would." MLG argued that Power's conduct "is both an abuse of the Firm's confidential information and an example of pre-resignation solicitation of a prospective client."

¶ 34

¶ 35                                    Trial Court Ruling

¶ 36        On June 1, 2020, the trial court entered partial summary judgment in favor of defendants on MLG's breach of fiduciary duty claims. The court found that MLG "lacks any evidentiary basis" for its claims that Cogan solicited Power to leave the firm or that Cogan and Power solicited MLG clients to leave and join another firm prior to their resignation. Without an actionable underlying claim for breach of fiduciary duty, MLG could not withstand summary judgment on count II (aiding and abetting breach of fiduciary duty) and count III (conspiracy to breach fiduciary duty). The court further found that MLG's aiding and abetting claim "hinges on speculation" since "MLG has presented no evidence that firm files were actually transferred."

¶ 37        Subsequently, on MLG's motion, the court entered an order finding no just reason for delaying enforcement or appeal of its summary judgment order pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016).

¶ 38                                          ANALYSIS

¶ 39        We review the trial court's grant of summary judgment *de novo* (*Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008)), keeping in mind that summary judgment is appropriate where "there is no genuine issue as to any material fact and *** the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2–1005(c) (West 2018). We construe the record strictly against the movant and liberally in favor of the nonmoving party. *Williams*, 228 Ill. 2d at 417. To prevail, the nonmoving party must present some evidence that would arguably entitle it to recover at trial. *Keating v. 68th & Paxton, L.L.C.*, 401 Ill. App. 3d 456, 472 (2010).

¶ 40        In *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460 (1998) (*Dowd I*), our supreme court outlined the rights and responsibilities of attorneys who leave their firms. Because attorneys must balance fiduciary responsibilities to their current firm with their duty to adequately represent

clients who follow them to their new firm, "we do not believe that lawyers are necessarily bound by the same fiduciary constraints that apply to nonlawyer officers and directors who are seeking to leave positions in commercial entities." *Id.* at 471. Thus, "some preliminary preparations by lawyers who are leaving a firm must be allowed, and \*\*\* it is appropriate for lawyers in these circumstances to make arrangements, prior to their departure, to obtain new office space, equipment, and other materials necessary for the practice of law." *Id.* at 470. " 'That this may be a delicate venture, requiring confidentiality, is simple common sense.' " *Id.* at 476 (quoting *Graubard Mollen Dannett & Horowitz v. Moskovitz*, 86 N.Y.2d 112, 120 (1995)). Additionally, "departing lawyers are permitted to prepare lists of clients *expected to leave the firm* and obtain financing based on the lists." (Emphasis in original.) *Dowd & Dowd, Ltd. v. Gleason*, 352 Ill. App. 3d 365, 376 (2004) (*Dowd II*).

¶ 41     Pre-departure solicitation of clients for the benefit of a new firm constitutes a breach of fiduciary duty. *Dowd I*, 181 Ill. 2d at 474; see also *Dowd II*, 352 Ill. App. 3d at 374 ("secretly attempting to lure firm clients to the new association, lying to partners about plans to leave, and abandoning the firm on short notice and taking clients and files would not be consistent with a partner's fiduciary duties"). However, " 'departing partners have been permitted to inform firm clients with whom they have a prior professional relationship about their impending withdrawal and new practice, and to remind the client of its freedom to retain counsel of its choice.' " *Dowd I*, 181 Ill. 2d at 476 (quoting *Graubard*, 86 N.Y.2d at 120). Such conversations would "[i]deally" only take place after the partners informed their firm of their intention to leave. (Internal quotation marks omitted.) *Id.*

¶ 42                    Cogan and Power's Departure from MLG

¶ 43        MLG argues that material issues of fact exist as to whether (1) Cogan solicited Power to leave; (2) Cogan had an affirmative duty to disclose to MLG that Power intended to leave; and (3) Cogan and Power solicited other MLG employees to leave.

¶ 44        The record does not reflect that Cogan solicited Power to leave MLG. On the contrary, there is ample evidence that Power independently decided to leave after being dissatisfied with the firm for years. In late fall 2010, he told Cogan that the firm was "dysfunctional" and "toxic" and "he didn't know *** whether he was in for the long run." He gave testimony critical of the firm in the arbitration proceedings, and his relationship with Mark further deteriorated after Mark reneged on a promised $60,000 bonus. Power testified that he and Mark "were not on speaking terms *** [a]fter he cheated me out of the 60 grand." It was Cogan's uncontradicted testimony that when the arbitrator issued his ruling, "[a]fter interpreting the ruling I said, 'I'm out of here.' And [Power] said, 'So am I.' " There is no evidentiary support for MLG's allegation that Cogan requested or enticed Power to leave.

¶ 45        MLG asserts that Cogan violated his fiduciary duty by not informing Mark and Ted that Power, "the single most important employee of the Firm," intended to leave. (MLG does not claim that Cogan and Power had a duty to disclose *their own* departure plans, only that *Cogan* had a duty to disclose *Power's* departure plans.) MLG alleges that if Mark and Ted had been aware of Power's plans, they could and would have incentivized Power to stay.

¶ 46        Illinois law does not require an attorney to inform his law firm that another attorney at the firm is planning to leave. As noted, attorneys may make pre-departure arrangements for continuing the practice of law, and our supreme court recognizes that as a matter of "simple common sense" such arrangements may be "a delicate venture, requiring confidentiality."

(Internal quotation marks omitted.) *Dowd I*, 181 Ill. 2d at 467. The trial court in *Dowd* certified several questions to our supreme court, including whether it was a breach of fiduciary duty for defendants to depart the plaintiff firm without giving notice to other officers or directors. *Id.* at 468. Our supreme court declined to answer this question in the affirmative but remanded for further factual determination. *Id.* at 468-77. On remand, multiple breaches of fiduciary duty were found, including pre-termination solicitation of clients, solicitation of firm employees, and "voting and accepting large bonuses for themselves *** [and] stripping [the firm] of cash reserves," but we did not find the mere failure to inform the firm of their impending departure was a breach of fiduciary duty. *Dowd II*, 352 Ill. App. 3d at 376-77.

¶ 47        Here, Power testified that his and Cogan's departure was, in fact, "a delicate venture, requiring confidentiality" (internal quotation marks omitted) (*Dowd I*, 181 Ill. 2d at 467). They were concerned that if Mark was informed of their plans, he would "call the clients and say things that weren't true *** and then interfere with the ability to represent the clients effectively and truthfully." As a matter of law, Cogan's failure to inform the firm of Power's departure was not a breach of fiduciary duty.

¶ 48        MLG's reliance on *Winston & Strawn v. Nosal*, 279 Ill. App. 3d 231 (1996), is misplaced. There, we found a triable issue of fact as to whether expulsion of a partner for investigating allegedly questionable billing practices of the firm's managing partner constituted a breach of fiduciary duty. *Id.* at 240-41. *Winston* is factually distinct from MLG's claim regarding disclosure of another attorney's impending departure.

¶ 49        MLG also alleges that Cogan and Power engaged in pre-termination solicitation of MLG attorneys Papin and Patti Tuttle. However, Papin was terminated from his employment at MLG on June 30, 2012, prior to Cogan and Power's resignation and Papin's subsequent employment

by C&P. As for Tuttle, MLG relies on an email by Cogan on July 4, 2012, stating that Tuttle "is giving her notice next week and will be here within three weeks." This email, dated after Cogan's resignation, does not support the allegation that Cogan solicited her prior to his resignation.

¶ 50    Finally, MLG alleges that Cogan and Power solicited Marshall and support staff Lutrell, Stefanek, and Sanchez. MLG does not cite any authority that solicitation of support staff constitutes a breach of fiduciary duty. Additionally, MLG has not alleged any damages in connection with the departure of these employees, all of whom worked for and were paid by the Cogan Unit. Under these circumstances, we do not find any alleged solicitation to constitute an actionable breach of fiduciary duty.

¶ 51                    Pre-Resignation Solicitation of Clients

¶ 52    MLG next argues that issues of material fact exist as to whether Cogan and Power solicited *Begum*, *Ayoola*, *Moskvine*, and other MLG clients prior to their resignation.

¶ 53                              Begum

¶ 54    In rejecting MLG's claim of client solicitation, the trial court found the conduct described in the Begum affidavit "does not rise to the level of a solicitation in violation of *Dowd*." Although *Dowd I* bars pre-departure solicitation of clients, it explicitly permits "inform[ing] firm clients" about an attorney's "impending withdrawal and new practice" (*Dowd I*, 181 Ill. 2d at 476), which Power did in his phone call to Begum in June 2012. Power did not attempt to solicit Begum's business for C&P until July 5, after his resignation, when he sent Begum a transfer letter.

¶ 55    For the first time on appeal, MLG argues that Power attempted to mislead Begum into believing that her claim would automatically go with him when he left MLG. Claims raised for

the first time on appeal are forfeited. *Mabry v. Boler*, 2012 IL App (1st) 111464, ¶ 24. In any event, we do not find any merit to this claim, since Begum stated that Power told her she "would need to sign something to transfer [her] case" and the transfer form that she later signed on July 5 clearly recited that it was the client's choice whether to transfer her case to C&P or remain at MLG.

¶ 56     MLG additionally argues that the trial court impermissibly weighed the evidence in finding that "the weight of Defendants' evidence and support having submitted 33 client affidavits in which the clients provided uncontroverted testimony that they were not solicited before Michael and John's resignation *** overcome the single affidavit of Ms. Begum submitted by MLG." Although a court may not weigh evidence in ruling on a summary judgment motion (*Coole v. Central Area Recycling*, 384 Ill. App. 3d 390, 396 (2008)), we are not bound by the trial court's reasoning and may affirm summary judgment on any basis that appears in the record. *Trigsted v. Chicago Transit Authority*, 2013 IL App (1st) 122468, ¶ 50. Here, where the record shows that Power's alleged phone conversation with Begum did not constitute impermissible solicitation under *Dowd*, the trial court correctly found no triable issue of fact.

¶ 57                              Ayoola

¶ 58     We additionally find no evidence that defendants solicited *Ayoola* prior to their resignation. Speculation, conjecture, or guess is insufficient to withstand summary judgment. *Sorce v. Naperville Jeep Eagle*, 309 Ill. App. 3d 313, 328 (1999). Here, MLG speculates that the June 13 phone conversations between Cogan and Power, Power and Papin, and Papin and Mrs. Ayoola may have been related to soliciting *Ayoola* for C&P, but the record contains no testimony or written communications supporting their conjecture. On the contrary, Papin testified that he had multiple phone conversations with Mrs. Ayoola because she directed him to keep her

apprised of developments in the case, but he never discussed transferring the *Ayoola* case until July 5. Cogan likewise testified that he had no information about *Ayoola* until after the Ayoolas retained C&P.

¶ 59        MLG argues that the phone calls may be used as circumstantial evidence of solicitation, citing *Dowd I* and *II*. There, defendants Gleason and Shreffler resigned as partners of Dowd & Dowd on December 31, 1990 to start a new firm, GMS. *Dowd II*, 352 Ill. App. 3d at 369. At issue was whether defendants improperly solicited Dowd client Allstate prior to their resignation. A paralegal at Dowd testified that she was told by Gleason in mid-December that GMS had "secured" Allstate. *Id.* at 374. A November 1990 credit memorandum prepared by Harris Bank indicated that "discussions have been had with [GMS'] principal client Allstate" and that "Gleason's group has a real lock on the Allstate business." *Id.* at 375. We found this circumstantial evidence supported an inference that defendants solicited Allstate's business prior to resigning. MLG has presented no such evidence here, merely supposition about what might have transpired in the June 13 phone calls, and, as such, has not raised a triable issue of fact as to solicitation of the *Ayoola* case.

¶ 60                                                    Moskvine

¶ 61        MLG argues that Power "used confidential firm resources and information to solicit the [Moskvine] matter and usurp MLG's corporate opportunity." The record reflects that Elena initially contacted Power in June 2012. After their face-to-face meeting, Elena said she would call him back "if she was interested in doing anything." Power took no further action and did not inform Mark and Ted of the conversation because "[t]here was nothing to follow up on at that point." This evidence does not support MLG's assertion that Power was "trying to drum up business for himself." We decline to speculate as to whether Power was able to assess the

potential value of the *Moskvine* case from his initial meeting with Elena. Moreover, MLG's claim for usurpation of a corporate opportunity is forfeited, being asserted for the first time on appeal. See *Mabry*, 2012 IL App (1st) 111464, ¶ 24.

¶ 62                                    Other MLG Clients

¶ 63        MLG argues that the *Begum* and *Ayoola* evidence is "part of a mosaic" and "helps prove a pattern" of pre-resignation solicitation. It asks rhetorically: "[I]f Defendants solicited Ayoola and Begum ***, whom else did they solicit?" Since we find no evidence of pre-resignation solicitation of *Ayoola* or *Begum*, those cases do not evince a pattern of solicitation.

¶ 64        MLG also argues that "[t]he timing of client notice and responses" demonstrates that Cogan and Power solicited other MLG clients prior to their resignation, since several clients responded to Cogan and Power's transfer letters sent on July 2 within the day. MLG's allegations are based on mere speculation, which is insufficient to withstand summary judgment. See *Sorce*, 309 Ill. App. 3d at 328.

¶ 65                                  MLG's Remaining Claims

¶ 66        Because MLG lacks an actionable underlying claim for breach of fiduciary duty, MLG is also unable to withstand summary judgment on counts II and III (aiding and abetting breach of fiduciary duty and conspiracy to commit breaches of fiduciary duty), both of which are premised on the allegation that Cogan and Power breached their fiduciary duties to MLG.

¶ 67                                        CONCLUSION

¶ 68        For the foregoing reasons, we affirm the trial court's grant of partial summary judgment in favor of defendants on counts I, II, and III of MLG's second amended complaint.

¶ 69        Affirmed.